ALAN J. VANDERMADE AND GLORIA JEAN VANDERMADE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 80000.    Filed June 30, 1961.

*Alan J. Vandermade*, pro se.
*Donald G. Daiker, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency in income tax against the petitioners with respect to the calendar year 1954, in the amount of $539.82.

The sole issue presented for decision is whether the amount of $2,557.04, paid in 1954 to or on behalf of petitioner Alan Vandermade by General Industrial Equipment Company of Palo Alto, California, as reimbursement for expenses incurred by him in transporting his family and moving their household effects to Palo Alto, is includible in his gross income for said year, as determined by respondent.

A second issue raised by the pleadings relates to the disallowance by the respondent of a portion of the medical expenses claimed by petitioners on their return. The respondent's adjustment was made solely as a consequence of his including the above-mentioned amount of $2,557.04, in petitioners' gross income. The total amount expended by petitioners for medical care is not in dispute. Accordingly, resolution of this second issue depends entirely upon our disposition of the first issue.

### FINDINGS OF FACT.

Petitioners Alan J. and Gloria Jean Vandermade are husband and wife, residing in Los Altos, California. They filed a joint Federal income tax return for the calendar year 1954 with the district director of internal revenue at San Francisco. The term "petitioner" in the singular, as used herein, has reference to Alan J. Vandermade.

On February 1, 1954, and for approximately 7 years prior thereto, petitioner was and had been employed by the Niagara Blower Company (hereinafter called Niagara), as a sales engineer, in the New York City area. Niagara's business was that of manufacturing and selling refrigerating, air-conditioning, and dehumidifying equipment to industrial establishments.

Petitioner's duties as a sales engineer for Niagara consisted of calling on business establishments in his sales area, to solicit their purchase of equipment manufactured by Niagara. After petitioner had succeeded in selling equipment, it was his duty to take care of any servicing problems that might arise in connection with the customer's use of the equipment. Petitioner did not himself repair or service equipment; but rather he acted in the capacity of a "trouble shooter," making arrangements for any repairs or adjustments to the equipment that might be required.

Petitioner's employment by Niagara was on a year-to-year basis. On December 1, 1953, he and Niagara executed an instrument entitled "Salesman's Contract on Salary and Bonus Plan," the here-material provisions of which are as follows:

Niagara Blower Company, hereinafter called the Company, employs A. J. Vandermade hereinafter called the Salesman, as a salesman out of the New York office of the Company for the contract year beginning Dec. 1, 1953 and ending Nov. 30, 1954 unless sooner terminated in accordance with the terms of this contract.

The Salesman undertakes to devote his entire business time, attention and energy to the performance of his duties as such salesman, subject to the direction and control of the Company, and to serve the Company diligently and to the best of his ability.

Provided the Salesman faithfully complies with all the terms and conditions of his employment, the Company will pay the Salesman:

(a) $390.00 per month (hereinafter called "Salesman's Base Rate"), * * *.

(b) In addition to the "Salesman's Base Rate", a bonus as provided by paragraph "VII" of this agreement.

The annexed standard terms of the Company's Salesman's Contract on the Salary and Bonus Plan * * * are made * * * a part of this contract * * *.

*　　　*　　　*　　　*　　　*　　　*　　　*

IV. Assigned Territories.

The following territory is assigned to the Salesman, which he is expected to cover under the direction of the Company:

As directed by Paul H. Schoepflin, President or R. C. Knight, Director of Sales

The Company reserves the right to transfer a Salesman from one territory to another at any time during the duration of this contract, but will exercise its right only in good faith, when deemed by it imperative in order to protect the Company's interests under unusual circumstances.

On February 1, 1954, petitioner was a member of the Niagara Blower Company's Employees' Profit Sharing Trust. Niagara's contributions to said employees' trust were made annually, as of the close of business on November 30, the last day of Niagara's fiscal year.

Niagara employed a number of sales engineers, like petitioner, for the purpose of selling its products; and these individuals were located in New York and certain other major cities throughout the country. In addition, Niagara had contractual arrangements with several separate companies, under which the latter were granted franchises to serve as distributors of Niagara's products in particular localities.

These franchise distributors employed their own sales engineers. Among Niagara's franchise distributors in 1954 was the General Industrial Equipment Company (hereinafter called General) of Palo Alto, California. General's principal shareholders were L. H. Rood (its president and general manager) and his wife. Neither Niagara nor any of its shareholders owned any of the stock of General; and neither General nor any of its shareholders owned any of the stock of Niagara.

General's method of operating was as follows. It usually employed four or five sales engineers, whose duties were about the same as those which petitioner performed for Niagara. General's principal customers were business firms in the food industry in California, for which firms General's sales engineers designed complete air-conditioning and "heat exchange" systems. These systems often required items of equipment other than those manufactured by Niagara. General was paid a commission by Niagara on the sales of Niagara's products, which were effected by General's sales engineers. Such sales of Niagara's products by General's employees in 1953 and 1954, amounted to approximately 10 percent of Niagara's total sales for those years.

In the early part of February 1954, General had lost the services of all its sales engineers. Rood, its president, telephoned to Niagara's director of sales (R. C. Knight) and asked that Niagara let General have one of the former's experienced sales engineers. Knight in turn spoke with the petitioner, and urged that he go to Palo Alto and take a position with General. Petitioner was reluctant to leave Niagara's employment inasmuch as he believed that his work in New York was about to yield sizable sales commissions, and also for the reason that he had just built a new home. Knight countered with the suggestion that petitioner go to California on a temporary basis, so as to permit petitioner and Rood to become better acquainted before making a final decision on whether petitioner should sever his ties with Niagara and affiliate completely with General. Petitioner agreed with Knight's countersuggestion; and thereupon the following agreement covering the petitioner's services to be rendered to General, was worked out between General and Niagara on about February 19, 1954:

As requested, we [Niagara] are going to supply you [General] with the services of Mr. A. J. Vandermade for such period, not exceeding 6 months, as may be agreeable to you and to him. While this arrangement continues, his time will be fully available to you for the purposes of your business. The terms upon which this arrangement is made are as follows:

1. Mr. A. J. Vandermade remains in our employ, but this shall not prevent his also entering your employ to any degree consistent therewith.

2. He will be carried on our payroll at a salary of $390.00 per month, which salary will be paid to him by us subject to all lawful requirements as to withholding, social security and the like as heretofore.

3. We consent that you may pay him, without consultation with us, such additional amount or amounts as may from time to time be agreed between

you and him, and with and for such payments by you we shall have no concern or responsibility whatsoever.

4. We will charge you, for making his services available to you as above, the sum of $390.00 per month, being an amount equal to the salary paid him by us as in paragraph 2 above. We may bill this to you monthly for prompt payment by you, or we are authorized hereby to deduct the same as due from any balance of commissions or otherwise at the time due you from us.

5. You agree to save us harmless of and from any and all liability or responsibility arising out of any action or non-action of Mr. A. J. Vandermade in the course of your business.

On or about March 1, 1954, petitioner arrived in Palo Alto,[1] where he began to perform the same type of services for General as he had been performing for Niagara. Petitioner worked under the direct supervision of Rood; and he did not receive any directions or instructions from Knight or any other officer or employee of Niagara. Petitioner continued to perform such services until some date prior to July 1, 1954. General paid petitioner $110 per month in addition to the $390 per month which Niagara paid him. Pursuant to the above-quoted agreement between Niagara and General, Niagara was reimbursed by General for the amounts which the former company paid to petitioner.

At an unspecified time shortly prior to July 1, 1954, petitioner and Rood decided that petitioner would sever his connection with Niagara and become an employee of General. However, arrangements were made with Niagara for petitioner to continue to remain on the payroll of Niagara, on the same reimbursable basis, until December 1, 1954—so that petitioner would be enabled to share in Niagara's contribution to its employees' profit-sharing trust for its fiscal year ended November 30, 1954. As part of the new arrangement between petitioner and Rood, it was agreed that General would reimburse the petitioner for the costs of moving his family and his household effects to California, from petitioner's residence in New Jersey.

During the interval between the time when petitioner made his new arrangement with Rood and July 1, 1954, petitioner's wife made a round trip by airplane from New Jersey to California, in order to find living quarters near Palo Alto. Thereafter on July 1, 1954, petitioner's wife and their children traveled by airplane to California to join petitioner in making their home in California; and a few days thereafter, a moving company brought their household effects to California.

During 1954, General paid the moving company for its services; and it also reimbursed petitioner for the amounts which he had expended for the airplane trips made by his wife and their children. The

---

[1] Traveling expenses incurred by petitioner on this trip to California were reimbursed to him by General. The amount of this reimbursement has not been included by respondent in petitioner's income.

total amount of General's said payments to petitioner and to the moving company, was $2,557.04.

Petitioner did not include any of the above-mentioned amount in the income which he and his wife reported on their joint income tax return for the taxable year 1954.

The respondent, in his statutory notice of deficiency, determined that the said sum of $2,557.04, constituted taxable income to petitioner for the year 1954.

### OPINION.

Decision of the issue herein must turn on whether the facts of this case bring it, (a) within the legal principle set forth in *John E. Cavanagh*, 36 T.C. 300, and in Rev. Rul. 54-429, 1954-2 C.B. 53; or (b) within the legal principle set forth in *United States* v. *Woodall*, 255 F. 2d 370 (C.A. 10), certiorari denied 358 U.S. 824, and in Rev. Rul. 55-140, 1955-1 C.B. 317.

The principle of the *Cavanagh* case and Rev. Rul. 54-429 is: That where an individual is transferred by his employer from one "official station" to another official station of the same employer, any amounts paid by the employer to or on behalf of the employee for expenses of moving the employee and his immediate family, and his personal and household effects, to the new station are not compensatory in nature; and that therefore, such amounts are not includible in the employee's income. The other principle which is set forth in the *Woodall* case and in Rev. Rul. 55-140, is: That where an individual enters into a new employment and, as part of this new arrangement, the employer agrees to pay either to or on behalf of the employee the expenses of moving him and his family, and his personal and household effects, to the place where he is to perform such new employment, any amounts paid to or on behalf of the employee by the employer under such arrangements are includible in the employee's income. The rationale underlying this latter principle is stated in the following paragraph from the Tenth Circuit's opinion in the *Woodall* case:

One of the conditions which induced taxpayers to accept employment was that their moving expenses to the place where they would be employed would be paid by the employer. While it is true that there was no gain or profit from the payments to the taxpayers, it cannot be denied that they received an economic and beneficial gain. Had the expenses not been paid by the employer, the burden would necessarily have been on the taxpayers. The payment was in the nature of a cash bonus as an inducement to accept employment. As a matter of law, these payments are no different than had * * * [the employer] given the taxpayers cash to pay outstanding obligations, or for the payment of living expenses for a specified period after their arrival in Albuquerque. The form of payment, to constitute income, is immaterial. The statute explicitly declares that gross income shall include. compensation for personal services of whatever kind and

in whatever form it is paid. *Commissioner* v. *Smith, supra* [324 U.S. 177]; *United States* v. *Joliet & C. R. Co.*, 315 U.S. 44, 49; *Old Colony Trust Co.* v. *Commissioner*, 279 U.S. 716. These payments come within the statutory description of gross income.

After considering and weighing all of the pertinent facts established in the instant case, we are of the opinion that decision herein is governed by the *Woodall* case and Rev. Rul. 55–140. We think that when petitioner first went to California in March 1954, he was being loaned by Niagara to General, on a trial basis; and that he continued to remain, in substance, an employee of Niagara. It seems apparent that, if either petitioner or Rood had decided during such trial period, that petitioner did not adequately fit into the organization of General, he (petitioner) would have been free to return to New York and resume the work which he had been doing for Niagara before going to California.

Thereafter, shortly before July 1, 1954, petitioner decided that he wanted to stay in California and work for General; and thereupon he and Rood entered into the new arrangement for him to be a permanent employee of General. The agreements made under the new arrangement were the motivating cause for him moving his family and his household effects to Palo Alto. The date when this new arrangement was reached is not established by the record; but whatever the time, it was under such new arrangement that General agreed to pay the expenses of moving petitioner's family to California. We think that such facts and circumstances bring the instant case within the rule of the *Woodall* case.

We approve the respondent's determinations herein.

*Decision will be entered for the respondent.*