ARTHUR J. KOBACKER AND SARA JO KOBACKER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 80437, 80707, 80708, 81012. Filed February 8, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith: Arthur J. Kobacker Trust for the Benefit of Alfred J. Kobacker II, Under Agreement of Trust dated Feb-

*Jerome C. Bachrach, Esq., Harvey M. Aronson, Esq.*, and *Sidney Hoffman, Esq.*, for the petitioners.

*Donald W. Howser, Esq.*, for the respondent.

Bruce, *Judge:* Respondent determined deficiencies in Federal income taxes of the petitioners as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 80437 | Arthur J. Kobacker, et ux_____ | 1955 | $25,408.05 |
| | | 1956 | 981.40 |
| | | 1957 | 1,115.95 |
| 80707 | Arthur J. Kobacker Trust for Benefit of Alfred J. Kobacker II_____ | 1955 | 3,804.80 |
| 80708 | Arthur J. Kobacker Trust for Benefit of Peggy Ann Kobacker_____ | 1955 | 3,804.80 |
| 81012 | James M. Kobacker, et ux_____ | 1955 | 15,137.69 |
| | | 1956 | 6,723.64 |

ruary 4, 1954, the City National Bank and Trust Company, Trustee, Docket No. 80707; Arthur J. Kobacker Trust for the Benefit of Peggy Ann Kobacker Under Agreement of Trust dated September 26, 1950, The City National Bank and Trust Company, Trustee, Docket No. 80708; and James M. Kobacker and Ann R. Kobacker, Docket No. 81012.

Certain issues were settled by stipulation of the parties. The remaining issues are: (1) Whether petitioners constructively received income in 1955 in the amount of $90,000 (allocated in proportion to their respective shareholdings in Reiner's), arising from payment of such amount by Reiner's, Inc., to Jerome M. Kobacker, and alternatively, whether the petitioner Arthur J. Kobacker and his wife constructively received income in the amount of $90,000 arising from such payment; (2) whether $7,500 received by petitioner James M. Kobacker in 1956 from Reiner's, Inc., was taxable income to him.

### FINDINGS OF FACT.

Certain facts have been stipulated and are incorporated herein by this reference.

Petitioners Arthur J. and Sara Jo Kobacker, husband and wife, reside in Steubenville, Ohio. They filed joint income tax returns for the years 1955, 1956, and 1957 with the district director of internal revenue at Cleveland, Ohio.

Petitioners James M. and Ann R. Kobacker, husband and wife, reside in Pensacola, Florida. They filed joint income tax returns for the years 1955 and 1956 with the district director of internal revenue at Columbus, Ohio, and at Cleveland, Ohio, respectively. James M. Kobacker is the brother of Arthur J. Kobacker.

Petitioner City National Bank and Trust Company, an Ohio corporation, is trustee for the Arthur J. Kobacker Trust for the benefit of Alfred J. Kobacker II under agreement of trust dated February 4, 1954, and the Arthur J. Kobacker Trust for the benefit of Peggy Ann Kobacker under agreement of trust dated September 26, 1950. Alfred J. Kobacker II, and Peggy Ann Kobacker are children of petitioner Arthur J. Kobacker. Hereinafter, these trusts will be referred to as the son's trust and the daughter's trust. Fiduciary income tax returns for the son's trust and for the daughter's trust were filed with the district director of internal revenue at Columbus, Ohio, for the year 1955.

For all years involved, all petitioners reported for Federal income tax purposes on the cash receipts and disbursements method.

Reiner's, Inc., 514 Market Street, Steubenville, Ohio (hereinafter referred to as Reiner's), was incorporated June 12, 1946, in Ohio by Samuel Reiner, Minnie Reiner, and their children, to carry on a department store business. In November 1952 Reiner's had 2,312 shares outstanding, all owned by the Reiner family. The Reiners are not related to petitioners.

In the fall of 1952 petitioner Arthur J. Kobacker, hereinafter sometimes referred to as Arthur, negotiated to buy the capital stock of Reiner's. The Reiner family set their selling price for the stock at $475,000. Arthur, his wife, and the trust for the benefit of his

daughter could personally raise only $125,000. The Reiner family rejected Arthur's suggestion that he, his wife, and his daughter's trust purchase $125,000 worth of Reiner's capital stock and that Reiner's redeem the balance of the stock for $350,000 payable partly in cash and partly by notes. The Reiner family was unwilling to consider any plan for the disposition of the stock other than an outright sale for cash. They refused to consider partial redemption of their shares by Reiner's. In making his proposal it was not Arthur's intention that Reiner's would reduce its business operation in any respect or conduct a different operation than it had conducted in the past.

Arthur arranged to obtain the remaining $350,000 of the purchase price from other relatives. James M. Kobacker, Arthur's brother, hereinafter sometimes referred to as James, agreed to put in $50,000 for capital stock. Arthur was advised by tax counsel against personally borrowing the balance of $350,000 to buy the stock, because this would require the declaration of dividends by Reiner's to secure funds to pay such debt, which would entail the payment of a great deal of income taxes. His tax counsel advised him to organize a corporation to purchase the stock.

On November 26, 1952, Arthur entered into a contract with the Reiner family to purchase all of the outstanding capital stock of Reiner's, consisting of 2,312 shares of common stock of the par value of $100 per share, for the aggregate price of $475,000.40 (hereinafter referred to for convenience as $475,000), of which $24,992.72 was required to be paid to and held by an escrow agent pending closing under the contract. Paragraph XII of the purchase agreement provided:

> Buyer [Arthur] is to have the right to assign this Agreement to a corporation, thereby releasing Buyer therefrom, and substituting such Corporation in the place of Buyer under this Agreement, with the same force and effect as if this Agreement were originally made with such Corporation, provided that such Corporation shall, by writing, agree to be bound by all of the terms, covenants and conditions of this Agreement.

The contract also provided that the purchase could be rescinded by Arthur if an examination in accordance with standard accounting practices found that the net worth of Reiner's was less than $560,000 as of October 31, 1952. When Arthur signed such contract, he did not contemplate that he would buy Reiner's stock in his own name.

On December 8, 1952, Alfred Investment Company (hereinafter referred to as Alfred) was incorporated under the laws of Ohio by Arthur, his wife, and James. Alfred was authorized to issue 2,500 shares of capital stock having a par value of $100 per share, as well as $177,500 in 15-year 5-percent debenture bonds. Arthur and his relatives transferred $477,500 to Alfred, which, pursuant to resolu-

tions of a meeting of its board of directors on December 9, 1952, issued stock, debenture bonds, and a promissory note as follows:

| | | |
|---|---:|---:|
| 1,750 shares of $100-par-value common stock | | $175,000 |
| (a) Arthur J. Kobacker | $97,500 | |
| (b) Sara Jo Kobacker (Arthur's wife) | 2,500 | |
| (c) City National Bank & Trust Company, Columbus, Ohio, Trustee for Peggy Ann Kobacker (Arthur's daughter) | 25,000 | |
| (d) James M. Kobacker (Arthur's brother) | 50,000 | |
| 15-year 5% debenture bonds | | 177,500 |
| (a) Trustees of Estate of Alfred J. Kobacker (Arthur's father, deceased Jan. 29, 1945) | 50,000 | |
| (b) Ida A. Kobacker (Arthur's mother) | 67,500 | |
| (c) James M. Kobacker (Arthur's brother) | 60,000 | |
| Promissory note: | | |
| Jerome M. Kobacker (Arthur's uncle) | | 125,000 |
| Total | | 477,500 |

The trustees for the estate of Alfred J. Kobacker, deceased, are the City National Bank & Trust Company, Columbus, Ohio, Ida Kobacker (wife of the deceased), Regina Kobacker Lesser (now Fadiman, daughter of the deceased), Jerome M. Kobacker (brother), and Harvey M. Aronson. The beneficiaries of said estate are Ida Kobacker during her lifetime, thereafter the three children of the deceased: Arthur, Regina, and James.

The 15-year debenture bonds are payable in annual installments of 10 percent of the face amount thereof commencing December 15, 1958, and draw interest at 5 percent per annum, on the unpaid balance of the principal amount, payable quarterly. They are subject to redemption upon call by payment of the balance owing plus accrued interest.

The $125,000 promissory note issued to Jerome on December 15, 1952, was payable on February 28, 1956, and drew 4½-percent interest. By endorsement of said note at his uncle's request Arthur guaranteed payment thereof according to its terms. He did not consider that he was thereby running a serious risk of personal liability, because the net worth of Reiner's stood behind the note.

On December 9, 1952, Arthur assigned the contract for the purchase of Reiner's capital stock to Alfred, which accepted the assignment "subject to all of the terms, covenants and conditions therein-contained, in like manner and effect as if the said Alfred Investment Company had been an original party thereto in lieu of the said Arthur J. Kobacker."

Jerome Kobacker's $125,000 was paid directly to Alfred on December 15, 1952, by certified check.

On December 15, 1952, Alfred purchased all 2,312 outstanding shares of Reiner's from the Reiner family for $475,000. The Reiner family transferred their stock certificates to Alfred.

Approximately 7 months later, in mid-1953, Alfred acquired the assets and lease incident to the operation of the men's, boys', and children's department of Reiner's which theretofore had been operated by one Samuel Little under lease from Reiner's. The purchase of these assets came about because of Little's dissatisfaction with a proposed action of Reiner's to permit Little to continue the children's department in another part of the store, while Reiner's expanded the men's department. Little was paid for his inventory and accounts receivable. His lease from Reiner's, Inc., was assigned to Alfred without consideration.

During the fiscal year ended January 31, 1954, Alfred transferred $8,875 to the holders of the debenture bonds and $5,625 to Jerome. The instruments of transfer of such funds designated the amounts as interest payments on said bonds and note, respectively. During its fiscal year ended January 31, 1954, Reiner's transferred the sum of $51,442 to Alfred, designating the same on its books as dividends paid. Such funds were the source of the aforementioned payments by Alfred to Samuel Little, the debenture bondholders, and Jerome.

Alfred and Reiner's filed consolidated corporation income tax returns for the fiscal years ended January 31, 1953, and January 31, 1954. The return for the fiscal year ended January 31, 1953, reflects no gross income from Alfred but expenses of $2,312.49, consisting of $1,812.49 interest and $500 legal expenses. Net income in the amount of $34,862.24 was reported for Reiner's, giving a consolidated net income of $32,549.75 and income tax due of $11,959.34. A Personal Holding Company return (Form 1120H) was included for Alfred, showing no surtax owing. The consolidated return for the fiscal year ended January 31, 1954, reflects net income of $43,238 for Reiner's and a net operating loss of $18,107 for Alfred, resulting in a consolidated taxable net income of $25,131 and income tax due of $8,013.66. In the computation of Alfred's net income, a deduction was taken for the $14,500 interest paid to Jerome M. Kobacker and the debenture bondholders. Alfred claimed no deductions for officers' compensation, buying expense, or office expense. The return reflects dividends paid to Alfred by Reiner's of $51,442, but the same were not includible in gross income on the return.

During the periods covered by the consolidated returns of Alfred and Reiner's, Arthur was president, Harvey M. Aronson was vice president and secretary, and Arthur's wife was treasurer, of both corporations. During these periods, Alfred also filed appropriate reports relating to Federal income and FICA taxes withheld from

employees, and Employer's Contribution Report for Unemployment Compensation purposes as required by the State of Ohio.

On January 16, 1954, an agreement of merger was entered into between Alfred and Reiner's, to be effective February 1, 1954. Under the terms of the agreement, Alfred was to be merged with and into Reiner's, the continuing corporation, which was to have authorized capital of 5,000 common shares with a par value of $100 each. The 2,312 shares held by Alfred were to be retired, and each outstanding share of Alfred was to be exchanged and converted into 1 share of Reiner's common stock of $100 par value. Reiner's was to carry on business with a stated capital of $175,000. It was to acquire all of the assets of Alfred and assume payment of the debts and obligations of Alfred. The Code of Regulations of Reiner's was to continue in effect. The agreement of merger was filed and recorded with the secretary of state of the State of Ohio on January 21, 1954.

Alfred was merged into Reiner's instead of vice versa because of the desirability of retaining Reiner's established credit relationships with merchandise suppliers.

The following are comparative balance sheets of Reiner's and Alfred at January 31, 1953, January 31, 1954, and February 1, 1954, and the adjustments and elimination of accounts as a result of the merger, as shown by the records of such companies:

REINER'S, INC., AND ALFRED INVESTMENT COMPANY

*Comparative Balance Sheets*

| | Jan. 31, 1953 | | Jan. 31, 1954 | | (Inter-company eliminations) | Reiner's (after merger, 2-1-54) |
|---|---|---|---|---|---|---|
| | Reiner's | Alfred | Reiner's | Alfred | | |
| Cash | $111,332 | $1,448 | $42,746 | $2,255 | | $45,001 |
| Accounts receivable (less reserve) | 224,391 | | 230,488 | | | 230,488 |
| Prepaid expenses | 12,071 | | 15,822 | 286 | | 16,108 |
| Miscellaneous receivables | 1,491 | | 1,460 | 567 | ($567) | 1,460 |
| U.S. Treasury bonds | 5,504 | | | | | |
| Inventories | 173,628 | | 159,537 | 33,660 | | 193,197 |
| Property and equipment (less reserves) | 125,008 | | 172,690 | 1,657 | | 174,347 |
| Reiner's stock | | 475,000 | | 475,000 | (475,000) | |
| | 653,425 | 476,448 | 622,743 | 513,425 | 475,567 | 660,601 |
| Accounts payable | 50,124 | | 25,476 | 5,725 | | 31,201 |
| Accrued expenses | 36,450 | | 23,022 | 1,688 | | 24,710 |
| Due leased departments | 9,319 | 1,812 | 3,357 | | (567) | 2,790 |
| Note payable | | 125,000 | | 125,000 | | 125,000 |
| Bonds payable | | 177,500 | | 177,500 | | 177,500 |
| Reserve for income taxes on realized profits | | | 15,900 | | | 15,900 |
| Capital stock | 250,000 | 175,000 | 250,000 | 175,000 | (250,000) | 175,000 |
| Less treasury stock | (34,228) | | (34,228) | | 34,228 | |
| Earned surplus | 341,760 | (2,864) | 339,216 | [1] 28,512 | (259,228) | 108,500 |
| | 653,425 | 476,448 | 622,743 | 513,425 | 475,567 | 660,601 |

[1] Includes dividends of $51,442 from Reiner's, not includible in the consolidated net income.

By the express terms of the merger Reiner's assumed and became liable for the debenture bonds and the promissory note originally

issued by Alfred. The debenture bonds issued by Alfred and assumed by Reiner in the merger evidenced an unconditional obligation to pay. They were not subordinated to any other indebtedness, they carried no voting rights, interest and principal payments thereon were not dependent on either corporation's earnings, all interest accruing thereon was paid as due, the shareholders did not endorse or guarantee their payment.

On February 1, 1954, Reiner's issued a $125,000 4½-percent promissory note, due February 28, 1956, to Jerome, in replacement of the identical note which had been issued to him by Alfred. This note evidenced an unconditional obligation to pay and was not subordinated to any other indebtedness, was negotiable, carried no voting rights, interest and principal payments were not dependent on the corporation's earnings, all such payments were made as due. The replacement note was guaranteed by way of endorsement by Arthur as follows: "By this endorsement I hereby guarantee payment of any unpaid balance of the within note plus accrued interest on maturity date." The other shareholders did not guarantee or endorse the said note. No claim was ever made under the guarantee.

On February 4, 1954, Arthur transferred 250 of his Reiner's shares to City National Bank & Trust Company, Columbus, Ohio, as trustee for his son, Alfred J. Kobacker II.

Reiner's made principal payments on its note to Jerome M. Kobacker as follows:

| Date | Amount |
|------|--------|
| Apr. 21, 1954 | $20,000 |
| July 1, 1954 | 15,000 |
| Paid in 1954 | 35,000 |
| Mar 12, 1955 | 20,000 |
| Apr. 21, 1955 | 12,500 |
| May 17, 1955 | 17,500 |
| June 21, 1955 | 20,000 |
| July 30, 1955 | 20,000 |
| Paid in 1955 | 90,000 |

Respondent determined that Reiner's shareholders constructively received income from Reiner's during 1955 in the amount of $90,000 "arising from the payment by Reiner's, Inc. of $90,000.00 to Jerome Kobacker as part of a series of transactions the substance of which was the constructive realization by you of taxable income" in such amount. Respondent allocated such $90,000 among the petitioners in proportion to their stockholdings in Reiner's, as follows:

| Name | Number of shares owned in 1955 | Amount |
|---|---|---|
| Arthur J. Kobacker and Sara Jo Kobacker | 750 | $38,571.44 |
| James M. Kobacker | 500 | 25,714.28 |
| City National Bank & Trust Company, Trustee for Peggy Ann Kobacker | 250 | 12,857.14 |
| City National Bank & Trust Company, Trustee for Alfred J. Kobacker II | 250 | 12,857.14 |
| Total | 1,750 | 90,000.00 |

On May 27, 1957, Reiner's purchased 150 of its shares from James for a consideration of $30,450, and on February 2, 1959, it purchased 207 of its shares from James for a consideration of $39,186, thereby reducing his remaining stockholdings to 143 shares.

During 1955 James and his wife, Ann, owned and resided in their home at 41 South Roosevelt Avenue, Columbus, Ohio, which had been purchased by James on February 2, 1954, for $30,000. In August 1955 Arthur, president of Reiner's, requested James to come to Steubenville, Ohio, and enter the employment of Reiner's as vice president and merchandise manager of the men's, boys', children's, and infants' departments. James was concerned that he would suffer a loss on the sale of his Columbus home if he moved to Steubenville. He required as a consideration to going to work for Reiner's that Reiner's pay him, in addition to a certain salary-bonus arrangement, an amount equal to any loss sustained on the sale of his house. Arthur agreed to this. James began full-time employment with Reiner's on or about September 27, 1955, in the capacity of vice president, buyer, and merchandise manager and continued his full-time employment until May 31, 1957. On January 19, 1956, James sold his Columbus residence for $32,500, netting $30,825.25 after costs of sale. James submitted to Arthur canceled checks and invoices of the costs of certain repairs, alterations, and furnishings. Arthur objected to some of the items and they agreed that Reiner's would pay James $7,500. Reiner's paid James such amount on August 1, 1956, pursuant to a resolution of a special meeting of the board of directors of the same date providing "that the company pay to James M. Kobacker additional compensation in the sum of $7,500.00 as reimbursement for his loss in the sale of his home in Columbus, Ohio."

James made capital improvements to his Columbus house to increase its original basis ($30,000) to at least $7,500 in excess of its January 19, 1956, net selling price.

The respondent determined that such $7,500 payment by Reiner's to James was taxable income to him.

Petitioners did not receive, either actually or constructively, any part of the $90,000 paid to Jerome M. Kobacker during 1955 by Reiner's.

James M. Kobacker realized taxable income in the amount of $7,500 by reason of his employer's reimbursing him for the loss he had incurred in selling his Columbus residence.

OPINION.

In the fall of 1952, Arthur J. Kobacker entered into negotiations to buy the stock of Reiner's, Inc., a corporation engaged in the department store business, all the stock of which was owned by the Reiner family. The Reiner family set the price for their stock at $475,000. Arthur, his wife, and a trust for the benefit of his daughter could personally raise only $125,000 and accordingly Arthur suggested that they purchase $125,000 worth of Reiner's stock and that the corporation redeem the balance of the stock for $350,000 to be paid partly in cash and partly by notes. The Reiner family rejected this suggestion, and refused to consider any plan other than an outright sale of all their stock for cash. Arthur's tax counsel advised him against personally borrowing the balance of $350,000, since this would require the declaration of dividends by Reiner's to provide funds with which to repay the debt and would entail the payment of considerable income taxes by him. His tax counsel advised the organization of a corporation to purchase the stock.

On November 26, 1952, Arthur entered into a contract with the Reiner family to purchase all of the outstanding stock of Reiner's, Inc., consisting of 2,312 shares of common stock, for $475,000, the purchase agreement specifically providing that Arthur might assign the agreement to a corporation. On December 8, 1952, Alfred Investment Company was incorporated under the laws of Ohio, with an authorized capital of 2,500 shares of $100-par common stock, and authorization to issue 15-year 5-percent debenture bonds in the aggregate amount of $177,500. Arthur, his wife, his daughter's trust, and his brother James, subscribed for and were issued 1,750 shares ($175,000 par value) of the common stock of Alfred. Alfred obtained $177,500 from the trustees for the estate of Arthur's father, his mother, and his brother James, for which Alfred issued 15-year 5-percent debenture bonds. In addition, Alfred borrowed $125,000 from Jerome M. Kobacker, Arthur's uncle, upon its promissory note bearing interest at the rate of 4½ percent.

Arthur assigned the contract to purchase Reiner's stock to Alfred on December 9, 1952, and, on December 15, 1952, Alfred purchased all of the 2,312 outstanding shares of Reiner's, Inc., from the Reiner family for $475,000 and the Reiner family transferred their stock certificates to Alfred. Thereafter, until February 1, 1954, the department store business was operated by Reiner's as the wholly owned subsidiary of Alfred. Consolidated income tax returns were filed by

Alfred and Reiner's for the fiscal years ending January 31, 1953 and 1954. A Personal Holding Company return (Form 1120H) by Alfred was filed with the consolidated return for the year ending January 31, 1953. Alfred also filed appropriate reports relating to Federal income and FICA taxes withheld from employees, and employer's contribution for unemployment compensation as required by the State of Ohio.

Approximately 7 months after its purchase of the Reiner's stock, Alfred also acquired the assets of the men's, boys', and children's department, which had theretofore been operated by Samuel Little under leases from Reiner's. Alfred paid Little for the inventory and accounts receivable. The lease was assigned to it without consideration. The exact amount of the inventory and accounts receivable purchased by Alfred from Little has not been shown. There is testimony Alfred purchased additional inventory during the period it operated the leased department. The amount of such purchases is likewise not shown. The consolidated return for the fiscal year ended January 31, 1954, shows total inventory purchased (including that obtained from Little), amounted to $86,079 and that Alfred had inventory on hand as of the end of the fiscal year in the amount of $33,660.

On February 1, 1954, pursuant to an agreement between Alfred and Reiner dated January 16, 1954, and filed with the secretary of state for the State of Ohio on January 21, 1954, Alfred merged with and into Reiner's as the continuing corporation. The 2,312 shares of Reiner's stock held by Alfred were retired, and each of the 1,750 outstanding shares of Alfred was exchanged for 1 share of Reiner's common stock. Reiner's acquired all the assets of Alfred and assumed all of its debts and obligations. The $125,000 4½-percent note which Alfred had previously issued to Jerome M. Kobacker was replaced by a $125,000 4½-percent promissory note due February 28, 1956, and payable to Jerome M. Kobacker, issued by Reiner's. Both the original and the replacement note to Jerome were endorsed by Arthur as guarantor. Reiner's made payments on the note to Jerome in the aggregate amounts of $35,000 in 1954 and $90,000 in 1955. Respondent determined that the $90,000 paid in 1955 constituted constructive dividends to petitioners allocable in proportion to their stockholdings in Reiner's.

Respondent contends that "The creation of Alfred to take title to Reiner's stock and execute the formalities of loans for $300,000 of the purchase price of such stock, and the purported merger of Alfred into Reiner's, were nothing more than a devious form of conveyance calculated to disguise the withdrawal of Reiner's earnings to finance petitioners' acquisition of beneficial ownership of Reiner's." In short, respondent's position is that Alfred was a sham or subterfuge, that the

loans to Alfred were in reality loans to petitioners and that the payments thereon by Reiner's constituted constructive dividends to petitioners. The tax effect of these "substantive facts," respondent states, is controlled by the principle that "the payment by a corporation of a liability representing part of the consideration for the purchase of its stock constitutes constructive receipt of dividends by the purchasing shareholders," citing as authority *Frithiof T. Christensen*, 33 T.C. 500; *Zipp* v. *Commissioner*, 259 F. 2d 119 (C.A. 6, 1958), affirming per curiam 28 T.C. 314, certiorari denied 359 U.S. 934; *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4, 1947); *Woodworth* v. *Commissioner*, 218 F. 2d 719 (C.A. 6. 1955), affirming a Memorandum Opinion of this Court; *Lowenthal* v. *Commissioner*, 169 F. 2d 694 (C.A. 7, 1948), affirming a Memorandum Opinion of this Court; *Ferro* v. *Commissioner*, 242 F. 2d 838 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; *Thomas J. French*, 26 T.C. 263; *Television Industries, Inc.*, 32 T.C. 1297, affd. 284 F. 2d 322 (C.A. 2, 1960).

Petitioners contend that the Kobacker-Reiner's transactions were nontaxable in substance as well as in form.

In form, petitioners point out that Alfred, not petitioners as individuals, borrowed the money here in question, paid it to the withdrawing shareholders (of Reiner's), took title to their stock, and later merged with its wholly owned subsidiary (Reiner's), thereby making that corporation liable for its parent's debts. It is petitioners' position they "had the right to select a non-taxable form for accomplishing what to them was a basically nontaxable transaction, namely buying into a corporation simultaneously with complete retirement of its old shareholders."

In substance, petitioners state, they invested $175,000 in Reiner's stock and that they got no more than they paid for, that is $175,000 worth of equity in Reiner's. They maintain that Alfred's merger into Reiner's achieved "precisely the same result as if Reiner's itself had originally borrowed the $300,000 and had used it to retire part of its outstanding stock." Thus, petitioners state "the substance and net effect of the Kobacker-Reiner's transactions was (1) petitioner's investment of $175,000 in Reiner's stock, (2) the borrowing by Reiner's of $300,000 more, and (3) the receipt of the whole $475,000 by Reiner's former shareholders."

It is well settled that a taxpayer has the legal right to so conduct his business transactions as to minimize the incidence of taxation, or altogether avoid the amount of what would otherwise be his taxes, by whatever means the law permits. *United States* v. *Isham*, 84 U.S. 496; *Gregory* v. *Helvering*, 293 U.S. 465, 469; *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451; *Zenz* v. *Quinlivan*, 213 F. 2d 914 (C.A. 6, 1954); *Aldon Homes, Inc.*, 33 T.C.

582. It is also settled that the taxpayer's motive to avoid taxation will not establish liability if the transaction does not do so without it. *Zenz* v. *Quinlivan, supra; United States* v. *Cumberland Pub. Serv. Co., supra.* On the other hand, as stated by the Supreme Court in *Higgins* v. *Smith*, 308 U.S. 473, "the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged event is *unreal or a sham* may sustain or disregard the effect of the fiction as best serves the purpose of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation." (Emphasis supplied.)

Thus, whether or not the payments aggregating $90,000 which Reiner's, Inc., made to Jerome M. Kobacker in 1955 constituted constructive dividends to petitioners depends primarily upon whether Alfred is to be disregarded as a sham or subterfuge and the borrowings by Alfred to be treated as the personal obligations of petitioners. Whether Alfred was a sham is a question of fact to be determined from all the facts and circumstances. *United States* v. *Cumberland Pub. Serv. Co., supra.*

In our opinion Alfred was neither unreal nor a sham, but a legal business entity formed for a legitimate business purpose.

It clearly was not *unreal*, since it complied with all the requirements of the corporate laws of Ohio, both in its organization and its subsequent operations, and it actually engaged in substantive business activity. It selected its own officers and directors, held separate meetings of its directors and stockholders, and maintained separate minutes of such meetings. The fact that the same persons were later selected as the officers and directors of Reiner's did not make it any the less a separate corporate entity. It kept separate books and accounts and made separate financial statements. It properly reported and accounted for Federal income and FICA taxes withheld from its employees and made employer's contributions for unemployment compensation to the State of Ohio. It also paid the interest on its debenture bonds and notes as it became due. Although the above activities may be said to be more or less formal compliances with corporate existence, they are nevertheless not to be ignored.

In addition to these more or less formal activities, the evidence clearly establishes that, to a substantial degree, Alfred actually engaged in substantive business activity. It acquired the assets of, and for a period of 6 or 7 months prior to the merger, under lease arrangements, operated one of the principal departments of the Reiner's store. Total inventory purchased, including that obtained from

Little, during the fiscal year ending January 31, 1954, amounted to $86,079. Its inventory at the end of the fiscal year January 31, 1954, was $33,660. Funds for such purchases, as well as for the interest payments mentioned above, were derived from dividends ($51,442) received from its subsidiary and from receipts upon the sale of such merchandise.

We think it is likewise clear that Alfred was not a *sham or subterfuge* created solely to avoid taxes. Petitioners were personally unable to meet the $475,000 price fixed by the Reiner family for all the stock of Reiner's. Arthur, his wife, and the trust for his daughter, first attempted to buy $125,000 of the stock of Reiner's and to have the corporation redeem the balance of its outstanding shares. Failing in this, Arthur and his wife, joined by his brother James, who had agreed to put in $50,000 for stock, organized Alfred to acquire all the then outstanding shares of Reiner's. The remaining $300,000 necessary to pay the Reiner family their asking price, was raised by Alfred from other relatives of Arthur upon debenture bonds and a note issued by Alfred. The Reiner's stock thus purchased became the property of Alfred and not of the petitioners. They personally acquired none of the stock of Reiner's until 13½ months later when the two corporations were merged and their stock in Alfred was exchanged for an equal number of the shares of Reiner's. Nor were any of the petitioners personally liable for the indebtedness of Alfred except to the extent Arthur was secondarily liable as a guarantor of the note to Jerome. This was a conditional liability which he might never be, and in fact never was, called upon to pay. See 5 Mertens, Law of Federal Income Taxation, sec. 30.03, p. 10. The stock of Reiner's which Alfred held was ample security for both the debenture bonds and the note. For the $175,000 which they paid for the stock of Alfred, petitioners acquired no more than an equity in Reiner's subject to its indebtedness. Thus, the value of the interest in Reiner's which petitioners acquired was tailored to meet the size of their pocketbook. The method employed was not a sham or subterfuge but one petitioners had a legal right to employ to avoid the *incurrence* of tax liability which might have resulted had they personally borrowed the money, used it to buy the stock of Reiner's, and later caused Reiner's to pay such indebtedness. The later merger of Alfred into Reiner's resulted in no greater economic benefit to petitioners, aside from operational savings. Their interest in Reiner's was still subject to the indebtedness incurred by Alfred and assumed by Reiner's. To be sure, their stock might become more valuable as the indebtedness was paid off and the corporation was able to pay greater dividends, but such appreciation in the value of their stock would not be taxable to petitioners until they sold or otherwise disposed of such stock.

Respondent has cited eight cases in support of the proposition that "the payment by a corporation of a liability representing part of the consideration for the purchase of its stock constitutes constructive receipt of dividends by the purchasing shareholders." Not only are the cases cited factually distinguishable, but the principle stated (assuming without determining its correctness) is not applicable in the instant case. Briefly stated, the shareholders sought to be taxed in each of these cases individually purchased and took title to the stock in question. The shareholders to be taxed were the original primary obligors and were personally liable to the selling shareholders before the corporation helped to discharge their personal obligations, by direct payments to the selling shareholders, by cancellation of debt to the corporation, or by redeeming from the purchasers all or a part of the stock they had acquired. We have found, in the instant case, however, that Alfred was not unreal or a sham and that it and not the petitioners was the purchaser of the Reiner's stock. Moreover, except for the secondary liability of Arthur, petitioners were not personally liable for the indebtedness incurred by Alfred for the purchase of the Reiner's stock. Accordingly, petitioners were not the "purchasing shareholders" on whose behalf the payments by the corporation were made. They received no part, constructively or otherwise, of the $90,000 payments which Reiner's made on the note to Jerome. It may be appropriate at this point to note that neither Alfred nor Reiner's, Inc., are parties to these proceedings. Cf. *Television Industries, Inc.,* *supra.*

Considering all the facts and circumstances presented herein, for the reasons hereinabove discussed, we hold that the payments aggregating $90,000 which Reiner's made on the note to Jerome in 1955 did not constitute constructive dividends to petitioners. Cf. *Ray Edenfield,* 19 T.C. 13; *Niederkrome* v. *Commissioner,* 266 F. 2d 238 (C.A. 9, 1959), remanding in part, for evidentiary reasons, a Memorandum Opinion of this Court.

For the same reasons, we likewise find no merit in respondent's alternative contention.

The second issue concerns the taxability of the $7,500 which was paid to petitioner James M. Kobacker by Reiner's, pursuant to corporate resolution which provided for "additional compensation in the sum of $7,500.00 as reimbursement for his loss in the sale of his home in Columbus, Ohio." When Arthur initially approached James about entering Reiner's employ, James required, as a condition of his going to work for Reiner's, the payment of an amount equal to the loss he might sustain on the sale of his Columbus house. Arthur agreed to this and the corporate resolution and payment followed.

It is settled that payments in the nature of a cash bonus or an inducement to accept employment or to secure services, constitute

compensation for personal services includible in gross income. *Commissioner* v. *LoBue*, 351 U.S. 243 (1956) ; *United States* v. *Woodall*, 255 F. 2d 370 (C.A. 10, 1958), certiorari denied 358 U.S. 824 (1958) ; *Alan J. Vandermade*, 36 T.C. 607. The payment in the instant case was bargained for by James Kobacker as a condition to his acceptance of employment with Reiner's. It was paid as an inducement to his acceptance of employment and characterized on Reiner's books as additional compensation.

Accordingly, we hold that petitioner James Kobacker (Docket No. 81012) realized additional taxable income in the amount of $7,500 as determined by respondent.

The case of *Otto Sorg Schairer*, 9 T.C. 549, relied upon by petitioner, James Kobacker, involved an employee who was required by his employer to transfer his place of living. He was reimbursed for loss on the sale of his home as depreciated. In that case, we held the payment was not includible in the employee's gross income, finding that the reimbursement was merely part of the amount realized by Schairer on the sale of his home. Since the petitioner in that case was already an employee of the company at the time he was required to move, it is factually distinguishable from the instant controversy and we need not reconsider our opinion therein.

> *Decisions will be entered under Rule 50 in Docket Nos. 80437 and 81012.*
>
> *Decisions will be entered for the petitioners in Docket Nos. 80707 and 80708.*