**PRINCESS COALS, INCORPORATED,**
a corporation, Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**SYCAMORE COAL COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America,**
Defendant.

**Nos. 1175 and 1176.**

United States District Court
S. D. West Virginia,
Charleston Division.

Feb. 18, 1965.

Campbell, McNeer, Woods, Bagley & Emerson, by Robert K. Emerson, Huntington, W. Va., for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Myron C. Baum, Dept. of Justice, Washington, D. C., and George D. Beter, Acting U. S. Atty., Charleston, W. Va., for defendant.

FIELD, Chief Judge.

In these actions plaintiff, Sycamore Coal Company, seeks to recover federal income taxes assessed and paid for the year 1958, and plaintiff, Princess Coals, Incorporated, seeks to recover federal income taxes assessed and paid for the years 1959 and 1960. The assessment of the taxes in both cases arose out of a common set of facts and, accordingly, they were consolidated for trial and disposition.

### Findings of Fact

The facts incident to this controversy were in a large degree stipulated by the parties and are found to be as follows:

1. Princess Coals, Incorporated (Princess) resulted from the merger of Princess-Elkhorn Coal Company (Elkhorn) into its parent corporation Powellton Coal Company (Powellton) accompanied by the change of the corporate name of the surviving corporation, Powellton, to Princess. This merger was consummated on January 1, 1959, and its tax consequences are not here in question.

2. The principal office of Princess is in Huntington, West Virginia. It keeps its books of account and reports for federal income tax purposes on the accrual method and on the basis of the calendar year.

3. Princess files its federal income tax returns with the Director of Internal Revenue, Parkersburg, West Virginia. For the years 1959 and 1960 Princess reported and paid federal income taxes in the amounts of $272,178.00 and $222,559.00, respectively.

4. Princess and its predecessor, Powellton, had issued and outstanding 82,300 shares of common capital stock having a par value of $1.00 per share and this stock was owned as follows:

| Stockholder | No. of Shares |
| --- | --- |
| The Girard Trust Corn Exchange Bank Trustee under deed of Permele E. Francis, dated September 2, 1958 | 10,000 |
| David L. Francis | 11,400 |
| David L. Francis, Guardian for James D. Francis, II | 600 |
| Nancy L. Francis | 2,000 |
| The Estate of James D. Francis, deceased | 14,500 |
| Permele Francis Meacham | 10,000 |
| Clay & Company | 33,800 |
| TOTAL | 82,300 |

5. David L. Francis and Russell Harman, both of Huntington, West Virginia, were respectively president and secretary-treasurer of Princess, Powellton and Elkhorn. The directors of these companies were David L. Francis, Russell Harman and Odell Fletcher, a trust officer of the Girard Trust Corn Exchange Bank of Philadelphia, Pennsylvania.

6. Elkhorn, a corporation created under the laws of the State of Delaware, was organized in the year 1940 and engaged in the business of mining coal in Floyd and McGoffin Counties, Kentucky.

7. Sycamore Coal Company (Sycamore), a corporation created under the laws of the State of West Virginia, was organized in the year 1910 and engaged in the business of mining coal in Mingo and Nicholas Counties, West Virginia, and Buchanan County, Virginia. Its wholly owned subsidiary, Cinderella Coal Corporation (Cinderella), a corporation created under the laws of the Commonwealth of Kentucky, engaged in the business of mining coal in Pike and Martin Counties, Kentucky. During the year 1958, Sycamore and Cinderella together owned, leased or controlled substantial coal reserves, and the aggregate coal production of these companies was approximately 3500 tons a day.

8. The principal office of Sycamore is in Huntington, West Virginia, and it files its income tax returns with the Director of Internal Revenue, Parkersburg, West Virginia. Sycamore keeps its books of account on the accrual method and on the basis of the calendar year.

9. For the year 1958, Sycamore reported and paid federal income tax in the amount of $53,351.47. For the years 1959 and 1960, Sycamore, on its federal income tax returns, reported net operating losses of $372,004.00 and $244,025.00, respectively. These losses were carried back to the years 1956, 1957 and 1958 and income tax refunds for such years in the aggregate amount of $293,228.00 were obtained by Sycamore.

10. During the year 1958, Sycamore had issued and outstanding 38,300 shares of its common capital stock, having a par value of $25.00 per share. Until the acquisition hereinafter described, none of its stock was owned directly or indirectly by Powellton, the shareholders of Powellton or by Elkhorn.

11. Sycamore's President, Charles Hamill, had been in ill health for several years and the company did not have in its employ an experienced man to replace Hamill as chief executive officer of the company. With this in mind, the directors of Sycamore directed Hamill to find a purchaser for the company.

12. In July, 1958, Hamill approached David L. Francis, President of Powellton and Elkhorn, in an effort to interest him in the purchase of Sycamore. At the outset, Hamill stated to Francis that any sale of Sycamore would have to take the form of a sale of stock rather than

assets. He insisted on a sale of stock in order to achieve what he described as a "clean" transaction, whereby his shareholders could avoid the delay, potential liability with respect to the performance of leases and tax problems which would attend the sale of Sycamore's assets followed by its liquidation. Hamill also insisted that the transaction should be an installment sale and that an amount in cash equal to the liquid assets of Sycamore, valued at $3,300,000.00, be paid to the Sycamore shareholders in a very short time. Hamill offered to sell the stock of Sycamore for $5,000,000.00.

13. Upon receipt of this information, Francis directed certain employees of Elkhorn to make a preliminary investigation of the financial condition of Sycamore, its coal reserves and physical assets. This investigation was conducted in August of 1958 and revealed that Sycamore and Cinderella, on a consolidated basis, had cash, accounts receivable and other liquid assets of approximately $3,300,000.00 and mining assets having a book value of approximately $1,700,000.00. All other assets, including deferred charges, had a book value of approximately $500,000.00 which offset all of the liabilities of the companies in the amount of approximately $440,000.00.

14. Francis concluded that Elkhorn was interested in acquiring control of only the mining assets of Sycamore and Cinderella and had no interest in the cash, receivables or other liquid assets of the companies. Francis determined that a fair price for the mining assets would be $1,200,000 rather than the book value of $1,700,000.

15. Francis then met with Harman and it was tentatively agreed, subject to the approval of the Board of Directors of Elkhorn, that Elkhorn would not be interested in acquiring control of the assets of Sycamore and Cinderella, unless the transaction could be arranged in such a manner that the assets of Elkhorn would not be liable for the performance of the Sycamore and Cinderella leases, or for any other liabilities or damages resulting from the mining operations of Sycamore and Cinderella. It was further agreed that if Elkhorn could be insulated and protected from these liabilities, Elkhorn would negotiate for an option for the stock of Sycamore which would reflect a purchase price of $1,200,000.00 for the fixed assets of Sycamore. Francis then requested Harman to formulate a practicable plan of acquisition.

16. Harman then met with Elkhorn's legal counsel to formulate a plan for the acquisition of the mining assets of Sycamore. It was agreed between Harman and counsel that there were two objectives to be accomplished in the acquisition. First, Elkhorn must not acquire the assets of Sycamore directly, because Elkhorn should not expose itself to the liability as lessee or assignee under the Sycamore leases. Second, the cash and liquid assets of Sycamore should be distributed to the former shareholders of Sycamore. In order to achieve the first objective, it was agreed that Elkhorn could not itself purchase the Sycamore stock and thereafter liquidate Sycamore and distribute its liquid assets to the former Sycamore shareholders.

17. Counsel and Harman then agreed that the above objectives could be accomplished by (a) the formation by Elkhorn of an insulating wholly owned subsidiary corporation, the capital of which would be supplied by Elkhorn, (b) the acquisition of all of the stock of Sycamore by the newly-formed subsidiary, and (c) the merger of Sycamore into the newly-formed subsidiary, with the result that Sycamore would be dissolved and the newly-formed subsidiary, as the surviving corporation, would hold title to all of Sycamore's assets, assume all of Sycamore's liabilities and complete the payment to be made to the Sycamore stockholders out of Sycamore's cash and liquid assets. In the event assignments of the coal mining leases under which Sycamore and Cinderella were mining could not be obtained from the respective lessors, Elkhorn's subsidiary would merge "downstairs" into Sycamore, with the result that Sycamore, as the surviv-

ing corporation, would receive all of the assets of the newly-formed subsidiary, assume all of its liabilities and complete the payment to be made to the Sycamore shareholders.

18. Thereafter, Harman, representing Elkhorn, met on frequent occasions with Hamill in an effort to obtain an option on the Sycamore stock. These negotiations culminated in the execution by the shareholders of Sycamore of an option agreement dated November 10, 1958, whereby the shareholders of Sycamore granted to Elkhorn an exclusive option to purchase all of the outstanding stock of Sycamore for the sum of $4,700,000.00, of which $1,410,000.00 was payable in cash on December 29, 1958, and the balance of the purchase price was to be evidenced by three promissory notes payable in the following manner to The First Huntington National Bank of Huntington, West Virginia, as agent for the Sycamore shareholders:

| Principal Amount | Due Date | Interest |
|---|---|---|
| $2,115,000.00 | 1/25/59 | None |
| $ 587,500.00 | 1/25/60 | 5% |
| $ 587,500.00 | 1/25/61 | 5% |

The option agreement provided that the option must be exercised on or before December 29, 1958, that during the option period, Elkhorn could make a thorough inspection of the properties and records of Sycamore, and that Elkhorn could assign the option to a wholly owned subsidiary but would be required to endorse the deferred purchase money notes.

19. Thereafter, on December 5, 1958, Elkhorn, pursuant to appropriate authorization as to creation and financing, caused the formation of Prinsyc Corporation (Prinsyc), a corporation created under the laws of the State of West Virginia. The certificate of incorporation of Prinsyc was issued by the Secretary of State on December 18, 1958. An organizational meeting of the shareholders of Prinsyc was held on December 19, 1958, and attended by the subscribers of the stock of the corporation. All of the sub-

scribers were nominees of Elkhorn. At this meeting, the subscribers adopted appropriate bylaws for Prinsyc and elected Francis, Harman and Odell Fletcher as directors. On the same day, the directors of Prinsyc met and elected Francis and Harman as president and secretary-treasurer, respectively. The directors authorized the issuance to Elkhorn of 100 shares of the common stock of Prinsyc (par value of $1.00 per share) for a consideration of $500,000.00. The directors further authorized Prinsyc to borrow the sum of $1,500,000.00 from Elkhorn, to be evidenced by the company's note or notes bearing interest at the rate of two per cent per annum.

20. On December 19, 1958, Elkhorn, by written agreement, assigned to Prinsyc all of its rights under the option agreement dated November 10, 1958.

21. On December 26, 1958, Elkhorn purchased 100 shares of the stock of Prinsyc for $500,000.00 of which $100.00 was designated as an investment in capital stock and $499,900.00 was attributed to capital surplus. On the same day, Elkhorn loaned Prinsyc the sum of $1,000,000.00, evidenced by the demand promissory note of Prinsyc dated December 26, 1958, and payable to Elkhorn, together with interest at the rate of two per cent per annum. This note evidenced an unconditional obligation. It was not subordinated to any other indebtedness. It was negotiable.

22. On December 26, 1958, Prinsyc exercised the option agreement dated November 10, 1958, which had been previously assigned to it as aforesaid, by delivering its check in the amount of $1,410,000.00 to The First Huntington National Bank, agent for the Sycamore shareholders, and by delivering to said bank the deferred purchase money notes called for by the option agreement, said notes having been executed by Prinsyc as maker and endorsed by Elkhorn. For the consideration of $4,700,000.00 represented by the cash and notes herein mentioned, said bank delivered to Prinsyc certificates properly endorsed in blank representing all of the outstanding cap-

ital stock of Sycamore, namely, 38,300 shares.

23. As hereinabove noted, on January 1, 1959, Princess absorbed Elkhorn by merger, the tax consequences of which are not germane to the issues in the instant actions. Thereafter, on January 9, 1959, Princess, having acquired by virtue of such merger the note dated December 26, 1958, executed by Prinsyc in favor of Elkhorn, loaned an additional $500,000.00 to Prinsyc, evidenced by the demand note of Prinsyc dated January 9, 1959, and payable to Princess with interest at the rate of two per cent per annum. This note evidenced an unconditional obligation. It was not subordinated to any other indebtedness. It was negotiable.

24. In the meantime, counsel for Prinsyc had made a thorough examination of the various leases under which Sycamore was mining coal as lessee. It appeared that several of the most important leases could not be assigned without the consent of the lessors, that the lessors were numerous and scattered, and that the interests of infants and heirs were involved. Counsel advised Harman that, as a practical matter, it would be difficult, if not impossible, to obtain the consent of all of the lessors to an assignment of some of the leases from Sycamore to Prinsyc. It then appeared that of the twenty leases under which Sycamore and Cinderella were mining coal, only three could not be assigned without the consent of the lessors. No difficulty was anticipated in procuring the assignment of two of the three leases. On or about January 1, 1959, Mr. Hamill, then employed by Princess, advised that it would not be practicable to even attempt to obtain an assignment of the so-called Baldwin lease which required the consent of numerous lessors and covered a substantial tract of coal on which Sycamore had been mining profitably. The directors of Prinsyc therefore finally determined that the assets of Sycamore could not be transferred to Prinsyc by way of merger or liquidation. To effect the same practical result, namely, a consolidation of the assets of Prinsyc and Sycamore, the directors of Prinsyc determined to merge Prinsyc into Sycamore.

25. Meetings of the Board of Directors of Prinsyc and Sycamore were held on January 15, 1959, and on that date a merger agreement, providing for the merger of Prinsyc into Sycamore, was approved by the directors and executed in behalf of the companies and by their respective directors. This agreement provided for the exchange by Princess of all of its stock in Prinsyc which was to be cancelled, for all of the stock to be issued by Sycamore. The capitalization of Sycamore, the surviving corporation, was changed to provide for an authorized capital stock of $5,000.00, divided into 5,000 shares having a par value of $1.00 each. The merger agreement was drawn to conform to the provisions of Section 63, Article 1, Chapter 31 of the Official Code of West Virginia of 1931, as amended, and paragraph 12 of such agreement provided as follows:

"12. All rights of creditors and all liens upon any property of Prinsyc and all debts and liabilities of Prinsyc will henceforth attach to and may be enforced against said surviving corporation, Sycamore Coal Company, to the same effect as if said debts and liabilities had been incurred or contracted by said surviving corporation. All the rights of creditors and all liens upon any property of Sycamore will be preserved and all debts and liabilities of Sycamore will continue as obligations of said surviving corporation."

The merger agreement was duly filed with the Secretary of State of the State of West Virginia, as required by law, and thereafter the Secretary of State issued his certificate of merger.

26. In accordance with the provisions of the merger agreement, Princess surrendered 100 shares of Prinsyc stock ($1.00 par value), constituting the entire issued and outstanding stock of Prinsyc

and, in exchange therefor, received 100 shares of the stock of Sycamore ($1.00 par value), constituting the entire issued and outstanding stock of Sycamore. The previously issued and outstanding stock of Sycamore was delivered by Prinsyc to Sycamore and the same was cancelled. Prinsyc transferred cash in the amount of $595,575.00 to Sycamore and, by the express terms of the merger agreement, Sycamore assumed all of the obligations of Prinsyc, including the deferred purchase money notes payable to The First Huntington National Bank, as agent for the former shareholders of Sycamore, and the notes aggregating $1,500,000.00 made by Prinsyc and held by Princess.

27. The net effect of the acquisition of the stock of Sycamore by Prinsyc and the subsequent merger of Prinsyc and Sycamore is shown by the following schedules:

## SCHEDULE A

### BALANCE SHEET OF PRINSYC AS OF JANUARY 1, 1959
#### (Following Acquisition of Sycamore Stock)

Assets:

| | |
|---|---:|
| Cash | $ 90,575 |
| Investment in Sycamore | 4,700,000 |
| TOTAL ASSETS | $4,790,575 |

Liabilities:

| | |
|---|---:|
| Current liabilities | $ 575 |
| Notes payable to former shareholders of Sycamore | 3,290,000 |
| Notes payable to Princess | 1,000,000 |
| TOTAL LIABILITIES | $4,290,575 |

| | |
|---|---:|
| Excess of assets over liabilities representing investment by Princess | $ 500,000 |

## SCHEDULE B

### CONSOLIDATED BALANCE SHEET OF SYCAMORE AND CINDERELLA AS OF JANUARY 1, 1959, AND COMPARISON WITH INVESTMENT BY PRINSYC

Sycamore and Cinderella Consolidated

| | |
|---|---:|
| Assets | $5,733,131 |
| Liabilities | 525,073 |
| Excess of assets over liabilities | $5,208,058 |
| Investment in Sycamore by Prinsyc | $4,700,000 |
| Excess of net assets of Sycamore over investment by Prinsyc | $ 508,058 |

## SCHEDULE C

### CONSOLIDATED BALANCE SHEET OF SYCAMORE AND CINDERELLA AS OF JANUARY 15, 1959, (After Reflecting Merger of Sycamore and Prinsyc) AND COMPARISON WITH INVESTMENT BY PRINCESS

| BALANCE SHEET [1] | Sycamore & Cinderella Consolidated | Prinsyc | Elimination of Investment | Sycamore & Cinderella Consolidated After Merger |
|---|---|---|---|---|
| **Assets:** | | | | |
| Investment in Sycamore | $ | $4,700,000 | $(4,700,000) | $ |
| Other | 5,733,131 | 90,575 [2] | | 5,823,706 [3] |
| TOTAL ASSETS .. | $5,733,131 | $4,790,575 | $(4,700,000) | $5,823.706 |
| **Liabilities:** | | | | |
| Notes payable to former shareholders of Sycamore | $ | $3,290,000 | $ | $3,290,000 |
| Notes payable to Princess | | 1,000,000 [2] | $ | 1,000,000 |
| Other liabilities | $ 525,073 | $ 575 | $ | $ 525,648 |
| TOTAL LIABILITIES | $ 525,073 | $4,290,575 | $ | $4,815,648 |
| Excess of assets over liabilities | $5,208,058 | $ 500,000 | $(4,700,000) | $1,008,058 |
| Investment in Sycamore by Princess (after exchange of its Prinsyc stock for Sycamore stock) | | | | $ 500,000 |

[1] Exclusive of earnings of companies between January 1st and January 15th, which were nominal.

[2] This schedule does not reflect the additional loan of $500,000 made on January 9, 1959, by Princess to Sycamore.

[3] This figure reflects the book value of the mining assets of Sycamore rather than the substantially lower value of such assets determined by the armslength transaction whereby Prinsyc acquired the stock of Sycamore for $4,700,000.

---

28. On January 25, 1959, Sycamore paid to The First Huntington National Bank, as agent for the former stockholders of Sycamore, the sum of $2,115,000.00 in discharge of the deferred purchase money note due on that date.

29. On its books of account, Sycamore, during the year 1959, accrued the sum of $59,326.73 as interest payable by it on the two notes dated December 26, 1958, and payable to The First Huntington National Bank, agent for the former Sycamore shareholders. It also accrued during such year the sum of $30,055.56 as interest on the two notes aggregating $1,500,000.00 held by Prin-

cess. These items of accrued interest were deducted by Sycamore on its 1959 income tax return.

30. On December 23, 1959, Sycamore paid to The First Huntington National Bank, as agent for the former shareholders of Sycamore, the sum of $587,500.00 in discharge of the deferred purchase money note due January 25, 1960, together with interest in the amount of $29,375.00.

31. On or about February 24, 1960, Sycamore transferred to Princess certain assets having a value on the books of Sycamore of $781,678.43 and the book value of such assets was credited against the notes aggregating $1,500,000.00 held by Princess.

32. On or about March 1, 1960, Sycamore, at the request of Princess, transferred to Sewell Coal Company assets having a value on the books of Sycamore of $533,042.72 and the book value of such assets was credited against the notes aggregating $1,500,000.00 held by Princess.

33. On its books of account, Sycamore, during the year 1960, accrued the sum of $29,200.67 as interest on the two $587,500.00 notes dated December 26, 1958, each in the principal amount of $587,500.00, and payable to The First Huntington National Bank, agent for the former shareholders of Sycamore. It also accrued the sum of $5,888.00 as interest on the unpaid balance of the notes aggregating $1,500,000.00 held by Princess. On its 1960 federal income tax return, Sycamore deducted these items of accrued interest.

34. By a 30-day letter dated May 28, 1962, the Director of Internal Revenue, Parkersburg, West Virginia, proposed deficiencies in federal income taxes against Princess for the years 1959 and 1960, in the amounts of $119,203.66 and $126,589.79, respectively. These deficiencies were based primarily upon the following proposed adjustments for the following years.

*Year 1959*

a. The revenue agent treated the above-mentioned payment of the sum of $2,115,000 by Sycamore to the First Huntington National Bank, as agent, as a constructive dividend received by Princess from Sycamore.

b. The revenue agent treated the above-mentioned interest accrual by Sycamore in the amount of $59,326.73 paid to the First Huntington National Bank, as agent, as a constructive dividend received by Princess from Sycamore.

c. The revenue agent treated the above-mentioned interest accrual by Sycamore in the amount of $30,055.56 on the indebtedness owed by Sycamore to Princess as a constructive dividend received by Princess from Sycamore.

*Year 1960*

a. The revenue agent treated the above-mentioned payment in the sum of $587,500 made by Sycamore to the First Huntington National Bank, as agent, as a constructive dividend received by Princess from Sycamore.

b. The revenue agent treated the above-mentioned credit of $781,678.43 against the indebtedness owed by Sycamore to Princess as a constructive dividend received by Princess from Sycamore.

c. The revenue agent treated the above-mentioned credit of $533,042.72 against the indebtedness owed by Sycamore to Princess as a constructive dividend received by Princess from Sycamore.

d. The revenue agent treated the above-mentioned interest accrual by Sycamore in the amount of $5,888 on the indebtedness owed by Sycamore to Princess as a constructive dividend received by Princess from Sycamore.

e. The revenue agent treated the above-mentioned interest accrual by Sycamore in the amount of $29,-

200.67 paid to the First Huntington National Bank, as agent, as a constructive dividend received by Princess from Sycamore.

35. On June 15, 1962, Princess paid to the Director of Internal Revenue, by delivering its check in the amount of $271,380.17 to the Collection Office of the Internal Revenue Service, Huntington, West Virginia, the following income tax deficiencies for the years 1959 and 1960, asserted by the Director in his letter dated May 28, 1962:

| | | | |
|---|---|---|---|
| Deficiency | $119,203.66 | $126,589.79 | $245,793.45 |
| Interest computed to 6/15/62 | 16,092.49 | 9,494.23 | 25,586.72 |
| TOTAL AMOUNT DUE | $135,296.15 | $136,084.02 | $271,380.17 |

36. By a 30-day letter dated May 28, 1962, the Director of Internal Revenue, Parkersburg, West Virginia, asserted against Sycamore a deficiency in federal income tax for the year 1958 in the amount of $52,311.79. This deficiency resulted from certain proposed adjustments, with respect to the years 1959 and 1960, which decreased the net operating loss claimed by Sycamore for such years, and thus the amount of the net operating loss carry backs for such years to the year 1958. The proposed adjustments were as follows:

*Year 1959*

a. The revenue agent disallowed the deduction by Sycamore of the above-mentioned interest accrual in the amount of $59,326.73 paid to the First Huntington National Bank, as agent.

b. The revenue agent disallowed the deduction by Sycamore of the above-mentioned interest accrual in the amount of $30,055.56 on the indebtedness owed by Sycamore to Princess.

*Year 1960*

a. The revenue agent disallowed the deduction by Sycamore of the above-mentioned interest accrual in the amount of $5,888 on the indebtedness owed by Sycamore to Princess.

b. The revenue agent disallowed the deduction by Sycamore of the above-mentioned interest accrual in the amount of $29,200 paid to the First Huntington National Bank, as agent.

37. On June 15, 1962, Sycamore paid to the Director of Internal Revenue, by delivering its check in the amount of $62,512.59 to the Collection Office of the Internal Revenue Service, Huntington, West Virginia, the income tax deficiency for the year 1958 in the amount of $52,311.79 asserted by the Director in his said 30-day letter, together with interest thereon in the amount of $10,200.80.

38. On or about July 3, 1962, Princess filed with the Director of Internal Revenue, Parkersburg, West Virginia, on Treasury Forms 843, claims for refund of income taxes for the years 1959 and 1960, in the amounts of $142,903.12 and $137,055.36, respectively. These claims were based upon the contention of Princess that the proposed adjustments hereinabove set forth, with respect to Princess, were clearly erroneous.

39. On or about July 3, 1962, Sycamore filed with the Director of Internal Revenue, Parkersburg, West Virginia, on Treasury Form 843, a claim for refund of federal income tax for the year 1958 in the amount of $63,072.36. This claim was based upon the contention of Sycamore that the proposed adjustments hereinabove set forth with respect to

Sycamore for the years 1959 and 1960 were clearly erroneous.

40. On or about December 5, 1962, Princess and Sycamore each received from the Director of Internal Revenue, Parkersburg, West Virginia, notice of disallowance of their respective claims for refund hereinabove mentioned. These actions followed.

### Discussion

■■ The Government takes the position that this is a case where substance should prevail over form, and that Prinsyc was merely a sham corporation which played its brief role in a series of transactions that had no valid business purpose other than the avoidance of taxes. From this hypothesis the Government argues that the doctrine of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, applies; that the interposition of Prinsyc should be ignored for tax purposes, and that the payments by Sycamore to its former shareholders, as well as its payments to Princess,[1] together with interest on those amounts, should be treated as constructive dividends to Princess. The corollary of this treatment of these payments would, of course, be the disallowance of the interest deductions taken by Sycamore on these items for the years in question. This argument of the Government, however, would elide the fact that there were valid and cogent business reasons for the manner in which this transaction was handled.

The evidence is clear that from the outset Princess was interested in acquiring only the mining assets owned by Sycamore. Princess neither needed nor wanted the liquid assets but found it necessary to include them in the negotiations because of the insistence of Sycamore's shareholders that they have a "clean" sale of their stock. Princess decided to handle the matter by the acquisition of Sycamore's stock, but deemed it advisable to insulate Princess from any

obligations incident to Sycamore's leases or any other contingent or latent liabilities of Sycamore. These were the reasons for the formation of Prinsyc and in my opinion they reflect a valid business purpose and objective. I might add that the Government's assumption that Princess did not have the necessary funds to purchase Sycamore's stock and chose this method in order to utilize Sycamore's assets to pay the bulk of the purchase price is not warranted by the evidence.

The Government seems to attach some significance to the fact that instead of merging Sycamore "upstairs" into Prinsyc as originally planned, Prinsyc was merged "downstairs" into Sycamore. The nonassignability of some of Sycamore's leases was the compelling reason for this change in plans. It occurs to me, moreover, that once the original shareholders of Sycamore were removed from the picture by sale of their stock, whether the merger went "upstairs" or "downstairs" should have no operative bearing upon the basic issue here involved. The Government contends that these circumstances clearly demonstrate that the present controversy falls within the ambit of those cases which hold that the use of corporate funds to discharge the obligation of an individual's stock purchase agreement is the equivalent of a dividend to the purchaser. Ferro v. Commissioner, (3rd Cir.) 242 F.2d 838. Wall v. United States, (4th Cir.) 164 F.2d 462. Those cases are inapposite here, however, for there was never any obligation running from Princess to Sycamore's stockholders. Princess had nothing but an option which it never exercised, but rather assigned to Prinsyc pursuant to its terms.

The Government argues, however, that the endorsement of Prinsyc's stock purchase notes by Princess-Elkhorn created an obligation from Princess to Sycamore's former shareholders which was discharged by Sycamore's payment of the

[1] Princess resulted from the merger of Princess-Elkhorn and Powellton. In view of the identity of interests, in this discussion the use of the name Princess will cover activities of both Princess-Elkhorn and Princess.

notes. The endorsement by Princess-Elkhorn was clearly an accommodation and created merely a contingent liability which could arise only in the event of Prinsyc's default. Such a default, of course, never occurred, and since there was no debt owed by Princess, it follows that no obligation of that corporation was discharged by Sycamore's payments. See Holsey v. Commissioner, (3rd Cir.) 258 F.2d 865; Arthur J. Kobacker, 37 T.C. 882. See also the recent decision of the Tax Court of the United States in Cromwell Corporation, et al., P 43.27 P–H TC involving a factual situation somewhat analogous to the present case.

■ Finally, the Government points out that Princess could have acquired the Sycamore stock directly and thereafter ordered a distribution of Sycamore's liquid surplus to pay the balance of the purchase price. It is observed that the use of this simple and direct route would have resulted in taxable dividends to Princess. Such an observation is not persuasive on the issue here, for the taxpayer had a legal right to adopt a method which would avoid the incurrence of tax liability [2] provided, of course, that it was not a mere sham or subterfuge. Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner v. Gilmore's Estate, (3rd Cir.) 130 F.2d 791; Arthur J. Kobacker, supra. This principle was clearly stated by Judge Haynsworth in Stout v. Commissioner, (4th Cir.) 273 F.2d 345, at page 352:

> " * * * If another transaction by which the parties might have come to substantially the same end would have resulted in tax liabilities because of the form in which it was cast, there is no reason to hold taxable a transaction cast in nontaxable form when the substantive bases of taxation are absent."

**2.** This principle should be especially appropriate in the present case where the net effect of the transaction was to liquidate all of the assets of Sycamore

In the light of these observations, I make the following findings and conclusions of law:

### Ultimate Findings and Conclusions of Law

1. Elkhorn, in procuring the option granted by the agreement dated November 10, 1958, to purchase the stock of Sycamore, did not incur any obligation to purchase such stock. Nor did Elkhorn incur any obligation to purchase such stock by assigning such option to Prinsyc.

2. Prinsyc, as assignee of the option granted by the agreement dated November 10, 1958, by its exercise of said option, obligated itself to purchase the stock of Sycamore.

3. Neither Elkhorn nor its successor, Princess, ever had or assumed any obligation to purchase the stock of Sycamore.

4. Sycamore, by the provisions of the merger agreement dated January 15, 1959, and in conformity with the provisions of the applicable West Virginia merger statute, assumed from Prinsyc the obligation to complete the payment for the stock of the former shareholders of Sycamore which was evidenced by the three deferred purchase money notes payable to such shareholders.

5. The payments by Sycamore to its former shareholders of $2,115,000.00 and $587,500.00, the principal amounts of the deferred purchase money notes due on January 25, 1959, and January 25, 1960, respectively, together with interest on all of the interest bearing deferred purchase money notes payable to such shareholders, were not received by Princess; nor did Princess, by reason of such payments, receive any financial or economic advantage constituting a constructive dividend subject to federal income tax.

6. The interest accrued and deducted by Sycamore during the years 1959 and

(with the exception of the mining assets) into the hands of Sycamore's former shareholders.

1960 on the interest bearing deferred purchase money notes payable to the former shareholders of Sycamore in the amounts of $59,326.73 and $29,200.67, respectively, was not received by Princess; nor did Princess, by reason of the actual payment of such interest to the former shareholders of Sycamore, receive any financial or economic advantage constituting a constructive dividend subject to federal income tax.

7. Sycamore was entitled, under the provisions of section 163(a) of the Internal Revenue Code, to deduct the sum of $59,326.73 and the sum of $29,200.67 on its income tax returns for the years 1959 and 1960, respectively, as accrued interest on the interest bearing notes payable to the former shareholders of Sycamore.

8. Prinsyc was organized for valid business reasons. There were bona fide and valid business reasons for its continued existence until the occurrence of the unforeseen circumstance which dictated that Prinsyc be merged with Sycamore.

9. Neither the formation nor the existence of Prinsyc was fictitious or lacking in substance. Prinsyc was not a sham and it may not be ignored for purposes of federal income taxes nor for any other purpose.

10. The negotiable note dated December 26, 1958, in the principal amount of $1,000,000.00 and the negotiable note dated January 9, 1959, in the principal amount of $500,000.00, both of which were executed by Prinsyc and held by Princess, evidenced unconditional obligations of Prinsyc.

11. As a result of the merger of Prinsyc and Sycamore, and the provisions of the applicable West Virginia merger statute, Sycamore assumed the obligation to discharge the bona fide indebtedness evidenced by the two notes aggregating $1,500,000.00 principal amount then held by Princess.

12. The receipt in 1960 by Princess and its nominee of certain assets having a book value of $1,314,721.15 transferred by Sycamore, constituted payments of interest and principal on the bona fide indebtedness owed to Princess and evidenced by the two notes aggregating $1,500,000 principal amount then held by Princess. The transfer of such assets did not constitute the payment by Sycamore of an actual or constructive dividend to Princess.

13. Sycamore was entitled, under the provisions of section 163(a) of the Internal Revenue Code, to deduct the sum of $30,055.56 and the sum of $5,888.00 on its income tax returns for the years 1959 and 1960, respectively, as accrued interest on the bona fide indebtedness of Sycamore evidenced by the two notes aggregating $1,500,000 principal amount held by Princess.

Counsel may submit a judgment order in accordance with these findings and conclusions.