Walter APSCHNIKAT et al., Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 19314.

United States Court of Appeals, Sixth Circuit.

Feb. 11, 1970.

S. Russell Smith, Louisville, Ky., Kirby A. Scott, Marshall K. Gilbert, III, Louisville, Ky., Charles E. English, Bowling Green, Ky., on the brief; Smith & Smith, Louisville, Ky., Harlin, Parker, Ricketts, Lucas & English, Bowling Green, Ky., of counsel, for appellants.

Janet R. Spragens, Dept. of Justice, Washington, D. C., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Jonathan S. Cohen, Attys., Dept. of Justice, Washington, D. C., on the brief; Ernest W. Rivers, U. S. Atty., Louisville, Ky., of counsel, for appellee.

Before CELEBREZZE, PECK and COMBS, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Western District of Kentucky against 15 taxpayers. In 1962, the Commissioner levied income tax deficiencies against the taxpayers, claiming that each had received a "constructive dividend" [1] in connection with the group's purchase of the Lenk Manufacturing Company. Having paid the deficiencies the taxpayers brought suit for refund in the District Court. At the conclusion of the taxpayers' evidence, the Court granted the Government's motion for directed verdict.

In 1957 the Lenk Manufacturing Company [hereinafter "Lenk"] was a Kentucky corporation engaged in the manufacture of soldering irons and butane blowtorches, and the filling of aerosol cans. Colonel D. Allen Lenk, who shared 88.47% of the voting control of Lenk with certain members of his family and a private foundation, and Lenk's president, Kenneth W. Burke, who shared 11.53% of the common stock with two other individuals, were at loggerheads as to policy matters concerning the corporation and the expenditure of its funds. Burke believed that unless Lenk kept abreast of its competitors by committing funds to expansion, Lenk would have no future.

Fully aware of Burke's desire to expand the business, in May, 1961, Colonel Lenk indicated that he, his family and foundation [hereinafter the "Lenk Group"] would be willing to sell their interest in Lenk to Burke and his associates [hereinafter the "Burke Group"]. Before he could consider purchasing the Company, Burke required assurance that he could raise the capital necessary to purchase Lenk, whose net worth at the time was about $500,000. Precision Valve Corporation [hereinafter "P.V.C."], one of Lenk's suppliers, offered a $250,000 loan. P.V.C. was willing to lend to the Lenk corporation,

---

1. Section 301, Internal Revenue Code of 1954, 26 U.S.C. § 301.

rather than to the Burke Group, because Lenk could increase P.V.C.'s sales and provide it with adequate security for repayment.

On October 20, 1961, Burke mailed the following letter to Colonel Lenk:

[LETTERHEAD FOR THE LENK MFG. COMPANY]

Franklin, Kentucky
October 20, 1961

Mr. D. Allen Lenk
12 Ferncroft Road
Newton (Waban), Mass.

Dear Mr. Lenk:

In order that I may have an Offer and Acceptance in writing, confirming our oral agreement in Boston on October 13, 1961, to submit to the lending agency which will help finance the transaction, I am asking that you and other stockholders of The Lenk Mfg. Company of Franklin, Kentucky, named below confirm the agreement by signing the Acceptance of the following Offer:

I will pay $100.00 per share for the preferred stock and $120.66 per share for the common stock of The Lenk Mfg. Company now owned by you, the Lenk Foundation, Mortimer Lenk, Burton D. Lenk, and Manuel Nizel as follows:

D. Allen Lenk—1881 shares preferred and 915 shares common

Lenk Foundation—950 shares preferred

Mortimer Lenk—220 shares preferred and 125 shares common

Burton D. Lenk—220 shares preferred and 12 shares common

Manuel Nizel—125 shares common

The prices for the shares are based on a total value of $550,000.00 for all outstanding shares of preferred and common stock.

You will continue to receive your pension of $125.00 per week for the remainder of your life.

It is my intention to complete this transaction not later than January 31, 1962.

Respectfully,
(s) Kenneth W. Burke

ACCEPTANCE

We, the undersigned, hereby accept the foregoing Offer, and agree to sell and properly deliver our shares of stock of The Lenk Mfg. Company to Kenneth W. Burke and his associates, free of any claim for distribution of earnings, upon being tendered $100.00 per share for our preferred stock and $120.66 per share for our common stock in accordance with said offer. This 3rd day of November, 1961.

(s) D. Allen Lenk
Lenk Foundation
By (s) D. Allen Lenk, Trustee
(s) Mortimer Lenk
(s) Burton D. Lenk
(s) Manuel Nizel

It is noteworthy that Lenk's attorney, Mr. Crow, acting for Burke, drafted both the "Offer" and the "Acceptance," neither of which was in any way modified by the Lenk Group.

On November 3, 1961, having signed the "Acceptance," the Lenk Group returned it to Burke. The testimony of the parties was that the sole purpose of this letter was to provide P.V.C. with a tangible basis for its offer of a loan; not to create an agreement between the signatories. The taxpayers also point out subsequent letters and safeguards which were built into the sale transaction which they argue would have been unnecessary had there been a firm commitment on the part of the Lenk Group to sell its stock.

Colonel Lenk would not permit the use of Lenk's name by any new corporation until the Lenk Group had received its money; and he did not want to "get involved" in liquidating Lenk. Burke, therefore, found it necessary to create Franklin Manufacturing Company to act as a holding company for the capital to

be used by the Burke Group to purchase Lenk. In addition, since the Burke Group still lacked $300,000 of the $550,000 purchase price, assuming the P.V.C. loan could be consummated, Franklin could be used as a vehicle to attract subscription capital to raise part of that sum.

Franklin was duly incorporated on January 12, 1962. To its capital, Burke and 18 other subscribers contributed $155,000, in exchange for stock in Franklin. Burke and two other Lenk shareholders contributed their 11.43% voting and preferred stock (total value: $66,996) to the capital of Franklin, in exchange for stock in Franklin.

P.V.C. had, by this time, consummated its $250,000 loan to Lenk, which Lenk would then make available to Franklin for the purchase transaction.

Still lacking the necessary capital, Franklin negotiated an $80,000 loan from Lenk to be used by Franklin to purchase the Lenk Group's shares.

The mechanics of the transfer included the deposit of the $155,000 contribution and the $80,000 loan to a bank account opened by Franklin. The $250,000 loan from P.V.C. to Lenk was deposited to the account of Franklin by an escrow agent. Simultaneously with the deposits, Franklin was required to draw certified checks to each member of the Lenk Group, these checks being given to the escrow agent. The escrow agent then exchanged the certified checks for the stock of the Lenk Group, which was cancelled only after the P.V.C. loan was secured by a mortgage on Lenk's physical assets. Franklin was issued new certificates, and Lenk became Franklin's wholly-owned subsidiary.

On January 27, 1962, Franklin merged downstairs into Lenk, pursuant to Kentucky statute, and on January 31st, Franklin, having been organized only 19 days earlier, went out of existence.

After the merger, Lenk assumed the debts of Franklin. At all times herein relevant, Lenk had earnings and profits of $327,752.

In the ordinary "bootstrap" acquisition, the purchaser recognizes no income where he purchases a corporation from which the seller has withdrawn any of the post-1913 earnings and profits. Ray Edenfield, 19 T.C. 13 (1952). *See generally,* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, § 7.25 (2d ed. 1966 & 1969 Supp.). However, where the purchaser personally obligates himself to buy the whole corporation, and uses part of the corporation's assets or capital to discharge his obligation, he receives a constructive dividend to the extent of the liabilities so assumed by the corporation, provided the corporation has sufficient earnings and profits. Wall v. United States, 164 F.2d 462 (4th Cir. 1947). Thus, a finding of dividend equivalency is required where the following elements coexist: First, a personal obligation of the taxpayers to purchase the corporation; second, a discharge by the corporation, out of its earnings and profits, of the taxpayers' personal obligation.

The question of dividend equivalency is one of fact, requiring thorough analysis of the facts and circumstances of each case. H. S. D. Co. v. Kavanagh, 191 F.2d 831 (6th Cir. 1951); Rheinstrom v. Conner, 125 F.2d 790 (6th Cir. 1942); Commissioner v. Champion, 78 F.2d 513 (6th Cir. 1935). Nevertheless, where both the facts and the inferences to be drawn therefrom point so strongly in favor of one party that reasonable men could not come to a different conclusion, a verdict should be directed.

"When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims." Brady v. Southern

Ry. Co., 320 U.S. 476, 479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

See generally, Moore, Federal Practice § 50.02 [1] (1968 ed.).

The holding of the District Court was warranted only if reasonable minds could not differ: (a) that the October 20 "Offer" from Kenneth W. Burke to the Lenk Group, and the signed "Acceptance" of the offer of "Kenneth W. Burke and his associates" which was returned on November 3, established a personal obligation on the part of the Burke Group to purchase the stock of the Lenk Group; and (b) that the Lenk Corporation discharged the taxpayers' obligations for them.

■ With respect to the first issue, the taxpayers argue that the October 20 letter was not intended to create a contractual obligation, but was solely intended to provide P.V.C. with evidence of Lenk's willingness to sell, in order to "firm up" P.V.C.'s offer of a loan. Insofar as members of the Lenk Group testified to the same effect, the taxpayers argue that the question of whether the October 20 letter and the November 3 acceptance created a contractual obligation on their part to purchase the Lenk Group's stock was a question of fact that should have been submitted to the jury. In the alternative they argue that if the letter did establish a personal obligation, only those taxpayers who knew of or were involved in the transaction prior to October 20 were bound. We cannot agree.

The October 20 letter, and the acceptance, contain offer and acceptance, identify the parties, subject matter, price, and time for performance. That letter is the only document in evidence which purports to memorialize an agreement for sale of stock totaling nearly half a million dollars. The subsequent performance of the parties breathed life into this document by executing it in full. If all the taxpayers had wanted was evidence for P.V.C. to firm up its offer, they could have obtained a letter of intent from the Lenk Group. This would have given rise to no obligation to purchase. They could have secured an option to purchase or a unilateral offer to sell from the Lenk Group. This would have given rise to no obligation to purchase. See Holsey v. Commissioner, 258 F.2d 865 (3d Cir. 1958). They could have inserted a clause into the letter indicating that it was assignable. That would have given rise to no personal obligation under the facts of this case. Arthur J. Kobacker, 37 T.C. 882 (1962) (Acq.).

From a reading of the record, particularly as to what transpired prior to the October 20 letter, we believe that letter created a personal obligation on the part of the Burke Group.

■ Several of the taxpayers herein became involved in this transaction after the October 20–November 3 contract was entered, having subscribed for stock in Franklin after December 4, 1961. Nevertheless, from a reading of the record, reasonable minds could not differ that Burke, prior to the incorporation of Franklin, was negotiating on their behalf. As Mr. Dodd, one of the taxpayers testified:

Q. * * * Franklin Manufacturing Company never even came into existence until January the 17th, the day you wrote your check?

A. That's correct.

Q. So prior to that, [Burke and his accountant] could not have been representing Franklin, could they?

A. No.

Q. They must have been representing somebody other than Franklin. Who were they representing, do you know?

A. The people who originally, later became the stockholders of Franklin Manufacturing Company.

Burton Lenk, one of the sellers, testified that Burke's associates were consulted at each stage of the negotiations, even before October 20:

Q. Now, at the October 13th meeting, this is October 13th, 1961, meet-

ing, which you attended with Mr. Burke, your father and Mr. Nizel, was Mr. Burke told the price that your father would be willing to sell?

A. Yes, he was.

Q. A price basis?

A. Yes, he was.

Q. And he mentioned one other thing that your father and you and your brother wanted?

A. Yes, this was, he wanted—he was told about the pension that would continue for the rest of my father's life for $125 a week.

Q. Now, was there anything else discussed or said or agreed to in this meeting of October 13th?

A. No, sir. Ken indicated that he would have to go back to his people and see what he could do, he could not make any—could not make any commitment at that meeting.

Q. Did he tell you why he could not or would not make any commitment?

A. Well, I know he didn't have the money, that was mentioned at the time, and just, he just kept saying, 'I will have to go back and discuss it with my people. I don't know what to say.'

From this and other testimony, and each of the taxpayers' signatures on the escrow agreement, it is clear that even those taxpayers who were not parties to the October 20–November 3 contract ratified it as a matter of law.

Having found that each of the taxpayers was personally obligated, as a matter of law, on the October 20–November 3 contract, we now turn to the issue whether or not Lenk discharged the taxpayers' personal obligation for them, thereby generating a constructive dividend. Sections 302 & 301, Internal Revenue Code of 1954, 26 U.S.C. §§ 302, 301.

■ The taxpayers argue that Franklin existed as a de jure corporation, that it was the purchaser in form as well as substance, Arthur J. Kobacker, 37 T.C.

882 (1962); Cromwell Corp., 43 T.C. 313 (1964); Princess Coals, Inc. v. United States, 239 F.Supp. 401 (S.D.W.Va. 1965), and that the October 20–November 3 contract made by them was in their capacity as agents of Franklin, John A. Decker, 32 T.C. 326, aff'd by order, Commissioner v. Decker, 286 F.2d 427 (6th Cir. 1960).

Franklin's tax return indicated that during its 19-day existence it had no gross receipts; no money came into the corporation by way of doing business. Franklin had no expenses; it had no employees, thus paid no salaries to employees; it paid no salaries to officers; it engaged in no industrial or commercial activity whatever; it kept no stock certificate book, and issued no stock certificates. Although no taxpayer testified that he was subscribing for stock in Lenk directly, most freely admitted subscribing to Franklin, never expecting to receive Franklin stock, as a means of acquiring stock in Lenk. On cross-examination, Mr. Lashlee, one of the taxpayers, put it this way:

Q. And you used Franklin as a means to [acquire the Lenk stock]?

A. As a matter of a vehicle to get our moneys together was my interpretation of it, sir.

Taxpayer Endress testified:

Q. What made you decided to [buy Franklin stock].

A. Because I knew that they were going to try to buy the Lenk Mfg. Company and if they were successful in doing so, I thought it would be a good investment.

Q. Based upon what you knew about Lenk?

A. Based upon what I knew about Lenk and the people that were running Lenk, yes.

Q. It was the purpose of that group to obtain control of the Lenk Corporation, is that right?

A. To buy it yes.

Q. To buy it, right?

A. Right.

Q. Did you have any other purpose in investing in Franklin Mfg. Company, other than the fact that Franklin Mfg. Company would be used to purchase Lenk Mfg. Company?

A. I had no other reason.

Q. No other reason. You never re-received any stock in Franklin Mfg. Company, did you?

A. No, I didn't expect to.

Q. The only stock you got was in Lenk?

A. Lenk, right.

Kenneth W. Burke testified:

Q. * * * Was there any business reason for creating Franklin, other than as some of the plaintiffs have testified, a device by which this could be accomplished?

A. I believe I testified, Mr. Fain, that the Franklin Mfg. Company had to be established because this was the only method that could be developed to satisfy the desires of Colonel Lenk and his group to sell their stock or for the purchase.

*   *   *   *   *   *

Q. Well, let's take it up to the point of the merger then. [Was there] any business reason other than accomplishing this desired end [the purchase of Lenk] for the creation of Franklin, without considering which would survive the merger?

A. You mean was there any other business purpose?

Q. Right.

A. No, sir.

We find that Franklin's only function was to act as a conduit for the purchase of Lenk with a substantial amount of Lenk's own funds, and, as such, it was merely a corporate extension of the acquiring shareholders' personalties. Cf. Commissioner v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). In view of our disposition of this case it is unnecessary for us to consider the de jure character of Franklin, the legitimacy of the merger, or the valid business reasons of the taxpayers for wishing to purchase Lenk. The discharge of the Burke Group's personal obligation by Franklin, using a substantial amount of Lenk's funds, resulted in a constructive dividend of $327,752.

We reject, as have other Circuits, the Government's contention that the taxpayers in this case have received any more substantial "economic benefit" than they would have had this transaction assumed some other form. *See, e. g.,* Holsey v. Commissioner, 258 F.2d 865 (3d Cir. 1958).

The judgment of the District Court is affirmed.

COMBS, Circuit Judge (dissenting).

I do not disagree with the majority's statement of the legal principles applicable to this case, but I think there is a total lack of proof to sustain the theory of the case on which they rely.

The District Court directed a verdict for the Government at the close of taxpayers' evidence on the theory that taxpayers had purchased Lenk Manufacturing Company with the corporation's own money, thereby receiving a benefit which amounts to a constructive dividend. The District Judge, in his analysis of the case and statement of his reasons for directing a verdict, made no finding, either directly or indirectly, that these taxpayers were bound by reason of a personal contract to purchase stock in the Lenk Company. We cannot find after diligent search that he even mentioned such a contract. By no stretch of the imagination can it be gleaned from this record that he directed a verdict on this theory.

The majority have rejected the hypothesis on which the District Judge relied and admit that, in the absence of a prior binding contract to buy the stock, taxpayers would not be liable for a tax. But, the majority find such a contract in the form of a letter offer from Kenneth W. Burke to Colonel Lenk dated

October 21, 1961, and the acceptance by the Lenk group of the offer of "Kenneth W. Burke and his associates" dated November 3, 1961. The form of the acceptance had been written by Burke at the bottom of his letter. This letter and acceptance, to my mind, cannot be held as a matter of law to be a contract for several reasons. First, everybody who had anything to do with the letter and who testified in this case swore that it was not intended to be a contract. This included Kenneth W. Burke; H. C. Peart, the Lenk Company's Kentucky accountant; and Burton Lenk, Colonel Lenk's son and the only member of the family to testify. Jo T. Orendorf, the attorney who handled the exchange of stock and money which consummated the sale, testified it was his understanding "there was no binding obligation to sell." Significantly, no one testified that the October 20–November 3 letter and acceptance was intended as a contract. The substance of the testimony of all the witnesses who knew about the letter and acceptance is that it was intended only for Burke's use in his efforts to borrow money with which to buy the company. For example, Burton Lenk, a signatory to the acceptance, testified:

> "The purpose of this letter was merely to show that we would agree at some future date to a price of $550,000 for this business. The further purpose of this letter was to help enable Ken and his associates or the company or somebody in Kentucky to raise the money to buy this business. As far as I am concerned, that is all this letter intended."

If the parties to an instrument which on its face appears to be a contract do not intend it as such, it will not be enforced against them. Long v. Jones, Ky., 319 S.W.2d 292 (1959); Johnson v. Dalton, Ky., 318 S.W.2d 415 (1958); Murphy v. Torstrick, Ky., 309 S.W.2d 767 (1958). If the intent of the parties is a disputed question of fact, it should be submitted to a jury. This rule is particularly applicable here because this instrument on its face does not appear to be a contract. No capable lawyer would prepare a contract covering a $500,000 deal by identifying the purchasers as "Kenneth W. Burke and his associates." The letter was signed only by Burke, and only by use of the word "associates" is anyone except Burke identified. It is established, however, beyond any possibility of doubt that the "associates" were an imaginary group at that time. The associates, with perhaps two exceptions, were later recruited by Burke and induced to buy stock in Franklin Manufacturing Company in the hope of acquiring stock in Lenk Manufacturing Company. There is no testimony that any of these taxpayers knew that the Burke letter of October 20 had been written. Burke is not a party to this suit. So, even if it should be admitted that the letter and acceptance constituted a contract as to him, that is not helpful here. The question whether Burke and the Lenk group intended the October 20–November 3 letter and acceptance to be a contract should have been submitted to the jury.

The majority hold that, though taxpayers were not parties to the October 20–November 3 letter and acceptance, they became personally liable to buy the Lenk Company because they somehow ratified Burke's action in writing the letter. I find no evidence of substance showing ratification. Certainly, there is not sufficient evidence to justify a directed verdict on this issue. Eleven of the taxpayers testified and only one, A. L. Dodd, gave any significant testimony in regard to ratification. Dodd agreed in a somewhat argumentative exchange with Government counsel that Burke must have been representing "the people who originally, later became the stockholders of Franklin Mfg. Company." All the others testified they had not designated anyone to represent them and that they had not confirmed or ratified any prior action taken by any other person. It seems to me this testimony has to be accepted at face value. Since many of these people were not recruited until

several weeks after the letter-acceptance had been written, there is no reason why they would have known about the letter or have been requested to ratify it. The quotation from Burton Lenk's testimony noted in the majority opinion as to what Burke said is to my mind of little consequence. Assuming that Burke did say to the Lenk group, "I will have to go back and talk with my people," this is hardly binding on "my people" who at the time were unknown to Burke and unknowing about his activities.

There is a suggestion in the majority opinion that the taxpayers ratified Burke's prior action when they signed what is referred to as an escrow agreement. I find absolutely nothing in the escrow agreement which could be construed as ratification of prior action taken by Burke in obligating himself to buy the Lenk Manufacturing Company. This was nothing more than an instrument signed by all the subscribers to the capital stock of Franklin Manufacturing Company agreeing that Orendorf, the attorney, would have authority to negotiate a loan from Precision Valve Corporation and to use the proceeds for payment of stock in Lenk Manufacturing Company. The Burke letter and the Lenk acceptance are not mentioned or referred to, directly or indirectly, in the escrow agreement. To prove ratification of a contract, it is necessary to show that the person who is to be bound had material knowledge of all relevant facts at the time of his ratification. Restatement of Agency (2d) § 91; Elk Valley Coal Co. v. Thompson, 150 Ky. 614, 150 S.W. 817, 822 (1912). It is also the rule in Kentucky that "When there is evidence of acceptance of benefits and ratification there is a question for the jury." Tarrants v. Henderson County Farm Bureau, Ky., 380 S.W.2d 274, 277 (1964).

To the extent that it is implied in the majority opinion that these taxpayers have by some sleight of hand acquired a $500,000 corporation by putting up only $155,000, I submit the implication is unwarranted. Assuming the value of Lenk Manufacturing Company to be $500,000, we have this situation:

| | |
|---|---:|
| Burke and two others already owned eleven plus per cent of the corporation, total value approximately | $ 67,000 |
| Burke and these taxpayers advanced | 155,000 |
| The corporation, by agreement of these taxpayers as stockholders, assumed a mortgage the proceeds of which were paid to Colonel Lenk in the amount of | 250,000 |
| Total | $472,000 |

According to my arithmetic, taxpayers' bargain was not tremendous.

I would remand the case for development of the facts in regard to the existence of a contract and the issue of ratification, with directions that substantial issues of fact on these questions be submitted to the jury.