RICHARD S. LACEFIELD AND MILDRED LACEFIELD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lacefield v. Commissioner
Docket No. 3914-67.
United States Tax Court
T.C. Memo 1973-34; 1973 Tax Ct. Memo LEXIS 252; 32 T.C.M. (CCH) 151; T.C.M. (RIA) 73034; February 13, 1973, Filed Jerry L. Moore, for the petitioners. Juandell D. Glass, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency in petitioners' Federal income tax liability for the taxable year 1962 in the amount of $11,271.88. Petitioners have conceded on brief that the October 20, 1961, offer and the November 3, 1961, acceptance constituted a valid contract to purchase 88.47 percent of the voting control of Lenk Manufacturing Company (Lenk). Therefore, the only 2 issues remaining for *253 our consideration are (1) whether Franklin Manufacturing Company (Franklin) was a sham corporation, and (2) whether Lenk's forgiveness of Franklin's monetary obligation to Lenk resulted in a constructive dividend to petitioners under sections 301, 316, and 317 of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. The material facts in the instant case are substantially the same as those in Apschnikat v. United States, 421 F. 2d 910 (C.A. 6, 1970), and the findings of fact in that case, except as modified and augmented by the record herein, are found to be the facts of the instant case. Petitioners, Richard S. and Mildred Lacefield, filed a joint Federal income tax return for the taxable year 1962 with the district director of internal revenue, Louisville, Kentucky. Petitioners' legal residence at the date of the filing of the petition herein was Bowling Green, Kentucky. Petitioner Mildred Lacefield is a petitioner herein *254 only by reason of having filed a joint return with her husband, Richard S. Lacefield, and the latter will hereinafter be 3 referred to as petitioner. In 1957 Lenk was a Kentucky corporation engaged in the manufacture of soldering irons and butane blowtorches, and the filling of aerosol cans. Colonel D. Allen Lenk, who shared 88.47 percent of the voting control of Lenk with certain members of his family and a private foundation, and Lenk's president, Kenneth W. Burke, who shared 11.53 percent of the common stock with two other individuals, disagreed as to policy matters concerning the corporation and the expenditure of its funds. Burke believed that unless Lenk kept abreast of its competitors by committing funds to expansion, Lenk would have no future. Fully aware of Burke's desire to expand the business, in May 1961 Colonel Lenk indicated that he, his family, and the foundation (the Lenk Group) would be willing to sell their interest in Lenk to Burke and his associates. Before he could consider purchasing the company, Burke required assurance that he could raise the capital necessary to purchase Lenk, whose net worth at the time was about $500,000. Precision Valve Corporation *255 (P.V.C.), one of Lenk's suppliers, offered a $250,000 loan. P.V.C. was willing to lend to the Lenk corporation, rather than to Burke and his associates, because Lenk could increase P.V.C.'s sales and provide it with adequate security for repayment. On October 20, 1961, Burke mailed the following letter 4 to Colonel Lenk: Franklin, Kentucky
October 20, 1961 Mr. D. Allen Lenk 12 Ferncroft Road Newton (Waban), Mass.
Dear Mr. Lenk: In order that I may have an Offer and Acceptance in writing, confirming our oral agreement in Boston on October 13, 1961, to submit to the lending agency which will help finance the transaction, I am asking that you and other stockholders of The Lenk Mfg. Company of Franklin, Kentucky, named below confirm the agreement by signing the Acceptance of the following Offer: I will pay $100.00 per share for the preferred stock and $120.66 per share for the common stock of The Lenk Mfg. Company now owned by you, the Lenk Foundation, Mortimer Lenk, Burton D. Lenk, and Manuel Nizel as follows: D. Allen Lenk - 1881 shares preferred and 915 shares common Lenk Foundation - 950 shares preferred Mortimer Lenk - 220 shares preferred and 125 shares *256 common Burton D. Lenk - 220 shares preferred and 12 shares common Manuel Nizel - 125 shares common The prices for the shares are based on a total value of $550,000.00 for all outstanding shares of preferred and common stock. You will continue to receive your pension of $125.00 per week for the remainder of your life. It is my intention to complete this transaction not later than January 31, 1962. Respectfully, (s) Kenneth W. Burke 5 On November 3, 1961, having signed the "Acceptance," The Lenk Group returned it to Burke. ACCEPTANCE We, the undersigned, hereby accept the foregoing Offer, and agree to sell and properly deliver our shares of stock of the Lenk Mfg. Company to Kenneth W. Burke and his associates, free of any claim for distribution of earnings, upon being tendered $100.00 per share for our preferred stock and $120.66 per share for our common stock in accordance with said offer. This 3rd day of November , 1961. (s) D. Allen Lenk Lenk Foundation By (s) D. Allen Lenk, Trustee (s) Mortimer Lenk (s) Burton D. Lenk (s) Manuel Nizel The October 20 offer and the November 3 acceptance are hereinafter referred to as the October 20-November *257 3 contract.
Colonel Lenk would not permit the use of Lenk's name by any new corporation until the Lenk Group had received its money; and he did not want to "get involved" in liquidating Lenk. Burke apparently found it necessary to create Franklin to act as a holding company for the capital to be used by Burke and his associates in purchasing Lenk. In addition, since Burke and his associates still lacked $300,000 of the $550,000 purchase price, assuming the P.V.C. loan could be consummated, Franklin could be used as a vehicle to attract subscription capital to raise part of that sum. Franklin was duly incorporated on January 12, 1962. Burke and 18 other subscribers contributed $155,000 to 6 Franklin's paid-in capital. Petitioner was one of Franklin's subscribers and contributed $15,000 to Franklin's paid-in capital. Burke and two other Lenk shareholders contributed their 11.53 percent voting and preferred stock (total value $66,996) to the capital of Franklin. P.V.C. had, by this time, consummated its $250,000 loan to Lenk, which Lenk would then make available to Franklin for the purchase transaction. Still lacking the necessary capital, Franklin negotiated an $80,000 *258 loan from Lenk to be used by Franklin to purchase the Lenk Group's shares. The mechanics of the transfer included the deposit of the $155,000 contribution and the $80,000 loan to a bank account opened by Franklin. The $250,000 loan from P.V.C. to Lenk was deposited to the account of Franklin by an escrow agent pursuant to an escrow agreement signed by all of Franklin's subscribers, including petitioner. Simultaneously with the deposits, Franklin was required to draw certified checks to each member of the Lenk Group, these checks being given to the escrow agent. The escrow agent then exchanged the certified checks for the stock of the Lenk Group, which was cancelled only after the P.V.C. loan was secured by a mortgage on Lenk's inventory and intangible assets. Lenk, thus, became Franklin's wholly-owned subsidiary. Franklin used $327,752.24 of the $330,000 borrowed from 7 Lenk to purchase the Lenk Group's stock. On January 27, 1962, Franklin merged downstream into Lenk, pursuant to Kentucky statute, and on January 31 Franklin, having been organized only 19 days earlier, went out of existence. During its existence, Franklin engaged in no commercial or industrial activity; *259 it produced no income and sustained no expenses; it paid no salaries either to officers or employees; and it kept no stock certificate book and issued no stock certificates to its subscribers. After the merger, Lenk assumed the debts of Franklin. Pursuant to its assumption of Franklin's debts, Lenk forgave the $330,000 indebtedness owed by Franklin to Lenk. At all times herein relevant, Lenk had earnings and profits of at least $327,752.24. Petitioner did not subscribe for Franklin stock until after the October 20-November 3 contract had been executed. Petitioner was fully aware that Franklin would have a temporary existence, and that it was formed solely as a vehicle for acquiring the Lenk Group stock on behalf of Franklin's subscribers. Petitioner never received any Franklin stock. Petitioner did ultimately receive 150 shares of Lenk common stock. Petitioner was also apprised, due to his signature on the escrow agreement signed by all of Franklin's subscribers, that a substantial sum of money was being borrowed by Franklin to finance the acquisition of the Lenk Group stock. 8 Petitioner retained his Lenk stock until September 1964, at which time he sold it for $16,500. *260 His economic gain from the sale of this stock was, thus, $1,500. Petitioner is a pharmacist and is manager of a drug store in which he owns a partnership interest. Lenk is located in Franklin, Kentucky. Franklin, Kentucky, is geographically adjacent to petitioner's community of Bowling Green, Kentucky. In 1961 and 1962 Bowling Green had an approximate population of 24,000 people. On May 24, 1967, respondent issued a statutory notice wherein petitioner's Federal income tax liability for the taxable year 1962 was increased to reflect the inclusion in petitioner's gross income of the amount of the purported constructive dividend resulting from Lenk's forgiveness of Franklin's monetary obligation to Lenk. OPINION In Apschnikat v. United States, supra, the Sixth Circuit considered on appeal an action brought by a group of petitioner's fellow investors in Franklin for a refund of taxes paid with respect to deficiencies resulting from the same transaction that produced the deficiency in the case at bar. In affirming the District Court's issuance of a directed verdict in favor of the Government, the Sixth Circuit determined (1) that Franklin was a sham corporation *261 which was "merely a corporate extension of the acquiring shareholders' 9 personalities"; (2) that Franklin's monetary obligation to Lenk was in effect the personal obligation of the acquiring shareholders; and (3) that the discharge of this obligation by Franklin [2] resulted in a constructive dividend to the taxpayers-appellants in Apschnikat. In reaching the latter two determinations, the Sixth Circuit reasoned that those taxpayers-appellants who had subscribed for Franklin stock after the execution of the October 20-November 3 contract had subsequently ratified the contract and, thus, were also personally obligated under the contract. We are *262 fully cognizant of the inherent difficulty in justifying the imposition of an $11,271.88 income tax deficiency where the taxpayer has had a realized economic profit of only $1,500. However, we cannot ignore that respondent's deficiency determination is deemed to be presumptively correct and that the burden of proof is upon the petitioner. Rule 32 of the Rules of Practice, United States Tax Court. Welch v. Helvering, 290 U.S. 111 (1933); and Hord v. Commissioner, 143 F.2d 73 (C.A. 6, 1944), affirming a Memorandum Opinion of this Court. 10 Moreover, since the underlying transaction and the legal issues in Apschnikat and the case at bar are identical, we are bound by the conclusion in Apschnikat pursuant to Jack E. Golsen, 54 T.C. 742 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971), unless petitioner can sustain his burden of establishing that the instant case is factually distinguishable from Apschnikat. See Estate of Ollie G. Rose, 56 T.C. 185 (1971); and Arnold T. Anderson, 55 T.C. 756 (1971). *263 We have devoted considerable thought to the case at bar. However, after carefully examining the entire record, we are compelled to conclude that petitioner has not satisfied his burden and that the instant case is not factually distinguishable from Apschnikat. Petitioner contends alternatively that Franklin was a viable corporate entity and was not a sham and that, even if Franklin is determined to be a sham, he was not apprised of all the material facts of the October 20-November 3 contract and, thus, could not have ratified it. We are not persuaded by these contentions. With respect to the first argument, the Sixth Circuit stated in Apschnikat v. United States, supra, at 915, as follows: Franklin's tax return indicated that during its 19-day existence it had no gross receipts; no money came into the corporation by way of doing business. Franklin had no expenses; it had no employees, thus paid no salaries to employees; it paid no salaries to officers; it engaged in no industrial or commercial activity whatever; it kept no stock certificate book, 11 and issued no stock certificates. Although no taxpayer testified that he was subscribing for stock in *264 Lenk directly, most freely admitted subscribing to Franklin, never expecting to receive Franklin stock, as a means of acquiring stock in Lenk. * * * Moreover, the record in the instant case clearly establishes that petitioner, like the taxpayers in Apschnikat, never anticipated receiving Franklin stock, and that he was fully apprised that Franklin was being utilized as a conduit for ultimately acquiring the Lenk Group's stock for the Franklin subscribers. Accordingly, since the Sixth Circuit has already considered in Apschnikat the issue of whether Franklin was a sham corporation, and since all the material facts with respect to the sham issue in the instant case are precisely the same as those in Apschnikat, we are required under Jack E. Golsen, supra, to conclude that Franklin was not formed to engage in any business activity, and that it was, therefore, a sham corporation for tax purposes. [3]
*265 12 Petitioner's alternative contention is that even if Franklin is characterized as a sham corporation, he did not ratify the October 20-November 3 contract and, thus, was not personally obligated with respect to Franklin's monetary obligation to Lenk. We are not convinced by this contention. Petitioner argues that he was not apprised of all relevant facts pertaining to the October 20-November 3 contract, and refers specifically to his purported lack of knowledge as to the aggregate purchase price for the Lenk Group's stock. We recognize that ratification of an act or transaction generally requires full knowledge of all relevant facts relating to the pertinent act or transaction. Fidelity & Deposit Co. of Maryland v. McComas' Adm'r., 295 Ky. 850, 175 S.W. 2d 1017 (1943). However, if sufficient circumstances exist which put a reasonably prudent man on inquiry as to facts of a particular act or transaction, the actual lack of knowledge of some or all of such facts should not preclude the ratification of the involved act or transaction. See Corpus Juris Secundum, Vol. *266 2A, section 73, pp. 668-669 (1972). An examination of the record discloses that sufficient 13 circumstantial factors existed which would have put a reasonably prudent man in petitioner's position on notice as to all facts, including the aggregate purchase price, of the acquisition of the Lenk Group's stock. Petitioner is an educated man. He has been professionally trained as a pharmacist, and functions as pharmacist and manager of the drug store in which he owns a partnership interest. Petitioner's $15,000 equity interest in Franklin constituted about 10 percent of Franklin's total paid-in capital. Moreover, petitioner was fully apprised that Franklin was only a conduit for the ultimate acquisition of the Lenk Group's stock by Franklin's subscribers. After considering the above factors, we have concluded that a reasonably prudent man in petitioner's position would have inquired into the aggregate purchase price of the Lenk Group's stock. A reasonably prudent man possessing petitioner's educational background and professional status and realizing that his investment in Franklin was only an indirect means of acquiring the Lenk Group's stock, would not have invested a substantial *267 sum such as $15,000 without first ascertaining the material details of the transaction, including the total purchase price for the Lenk Group's stock. In addition, the record contains two ancillary factors which support our conclusion. Petitioner testified at trial that he was persuaded to invest in Franklin (1) because the preservation of Lenk as a viable economic force would provide 14 a continued source of jobs for people living in petitioner's community, and (2) because some of his economic peers in his community had also invested in Franklin. Since petitioner's community (i.e., Bowling Green, Kentucky) is not large and had a population in 1961 of only approximately 24,000, we believe that it is highly improbable that petitioner would be completely isolated from both the community and all of his economic peers in the community who had similarly invested in Franklin. In this context, considering the publicity which this type of transaction would have generated, and the interplay which must have occurred between petitioner and other similarly-situated investors in Franklin in his community, we feel that it would be unreasonable to conclude that he was not fully apprised *268 of all relevant facts pertaining to the transaction. The only evidence introduced by petitioner to support his lack of knowledge as to the aggregate purchase price of the Lenk Group's stock was his uncorroborated testimony at trial to this effect. We are aware that it is not within our province to arbitrarily disregard a taxpayer's uncontradicted and unimpeached testimony. See Jay A. Williams, 28 T.C. 1000 (1957). However, we are not required to accept with finality a taxpayer's uncontradicted, self-serving testimony if there is sufficient improbability in his testimony to induce this Court to disregard such evidence. See A. H. Alexander, 56 T.C. 710 (1971); and Hasson v. Commissioner, 239 F.2d 778 (C.A. 6, 1956), 15 affirming a Memorandum Opinion of this Court. We are convinced that petitioner either was actually aware of the aggregate amount of the purchase price for the Lenk Group's stock or that, as a reasonably prudent man, he should have inquired into this fact. Either theory is consistent with the concept of ratification. We have, *269 therefore, concluded that petitioner did ratify the October 20-November 3 contract and that such ratification was evidenced by his acceptance of Lenk stock in lieu of Franklin stock. Since Franklin was a sham corporation, and since petitioner did ratify the October 20-November 3 contract, we must ultimately conclude that petitioner was personally obligated to the Lenk Group. See Apschnikat, supra, at 914-916. Accordingly, Lenk's subsequent usage of its funds to discharge petitioner's obligation did result in a constructive dividend to petitioner.[4] See Apschnikat, supra, at 916. Lenk possessed adequate earnings and profits at the time of the constructive distribution to petitioner to permit it (i.e., the constructive distribution) to be characterized as a dividend under section 301(c) (1). *270 Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954. ↩
2. See Apschnikat v. United States, 421 F.2d 910↩ (C.A. 6, 1970). We believe that it is more appropriate to analyze the constructive dividend in Apschnikat as resulting from Lenk's discharge of the Franklin subscribers' personal obligations to the Lenk Group (i.e., this is based on the Sixth Circuit's analysis that Franklin was a sham entity and that the contractual obligation contained in the October 20-November 3 contract to buy the Lenk Group's stock was, in effect, the obligation of the Franklin subscribers). 3. Petitioner has attempted to rebut the argument that Franklin was a sham corporation by reference to Cromwell Corporation, 43 T.C. 313 (1964), and Arthur J. Kobacker, 37 T.C. 882 (1962). We are aware that it is a conventional business practice for a new corporation to acquire the stock of a going business. See Cromwell Corporation, supra, and Arthur J. Kobacker, supra.However, these cases are factually distinguishable from the case at bar. In Cromwell Corporation, the newly-formed corporation was organized specifically to acquire the involved stock. Subsequent to this stock acquisition, the new corporation continued to operate as a holding company. In Kobacker, the new corporation was in existence for 13 months prior to its merger with the acquired corporation. Furthermore, the new corporation engaged in substantial business activity prior to the merger due to its operating a principal department of the acquired corporation, and, thus, produced income, sustained expenses, and maintained books and records. Therefore, since Franklin existed for only 19 days, engaged in no business activity during that time, and was organized with the preconceived intent of immediately merging with Lenk in order that Franklin's subscribers could acquire the Lenk Group's stock, neither Comwell nor Kobacker is appropriate precedent in the instant case. ↩
4. At first blush, it appears that petitioner and his fellow investors in Franklin expended approximately $480,000 to acquire only a $155,000 interest in Lenk. However, this apparent discrepancy is explained by the fact that the Lenk Group's preferred stock was, in effect, purchased for $327,100 (i.e., 3,271 shares of preferred stock at a purchase price of $100 per share). Thus, Lenk technically relieved the Franklin shareholders of their obligation to purchase the Lenk Group's preferred stock. The record does not disclose the present status of the Lenk preferred stock. ↩