T.C. Memo. 1996-462


UNITED STATES TAX COURT


JAMES H. LESTE AND STACY LESTE, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 17310-94, 17311-94,    Filed October 15, 1996.
17312-94, 17420-94.


<u>Sebastian D'Amico</u>, for petitioners.

<u>James J. Posedel</u> and <u>Gordon L. Gidlund</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  In these consolidated cases, respondent determined deficiencies in, an addition to, and penalties on petitioners' Federal income taxes as follows:

---

[1]  Cases of the following petitioners are consolidated herewith:  Richard W. Moore and Katherine J. Moore, docket No. 17311-94; James H. Leste, docket No. 17312-94; and First Associates Mortgage Corp., docket No. 17420-94.

James H. and Stacy Leste
Docket No. 17310-94

| | | Accuracy-Related Penalty |
|---|---|---|
| Year | Deficiency | Sec. 6662(a) |
| 1991 | $14,467 | $2,893 |

Richard W. and Katherine J. Moore
Docket No. 17311-94

| | | Accuracy-Related Penalty |
|---|---|---|
| Year | Deficiency | Sec. 6662(a) |
| 1989 | $37,712 | $7,542 |
| 1990 | 15,708 | 7,469 |
| 1991 | 18,930 | 3,786 |

James H. Leste
Docket No. 17312-94

| | | Accuracy-Related Penalty |
|---|---|---|
| Year | Deficiency | Sec. 6662(a) |
| 1989 | $40,312 | $8,062 |
| 1990 | 21,954 | 4,391 |

First Associates Mortgage Corp.
Docket No. 17420-94

| Year Ended | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|---|
| 10/31/89 | $82,867 | -- | $16,573 |
| 10/31/90 | 52,626 | -- | 10,525 |
| 10/31/91 | 92,046 | $12,625 | 18,409 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are:

(1) Whether payments made by corporate petitioner First Associates Mortgage Corp. (FAMC) to Valentine Silbernagel (Silbernagel), pursuant to a consulting and noncompetition agreement, represent compensation deductible under section 162(a), as petitioners contend, or additional consideration to Valentine

Associates Ltd. Corp. for James H. Leste's and Richard W. Moore's purchase of FAMC's stock, and thus nondeductible by FAMC and taxable as constructive dividends to the individual petitioners, as respondent contends;

(2) whether all petitioners are liable for the accuracy-related penalty under section 6662(a) pertaining to the above issue;

(3) whether the Lestes and the Moores are liable for the accuracy-related penalty under section 6662(a) for failing to properly report bonus income received from FAMC on their individual income tax returns; and

(4) whether FAMC is liable for the accuracy-related penalty under section 6662(a) for overstating its cost of goods sold by $202,525 for its fiscal year ended October 31, 1991.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time of the filing of the petitions, the Lestes and the Moores resided, and FAMC's principal place of business was located, in California.

FAMC was incorporated on February 26, 1986; it was a wholly owned subsidiary of Valentine Associates Limited Corp. (VALC). VALC was incorporated in 1973 and was engaged in the business of providing collection and accounting services to mortgage lenders (loan servicing). At all relevant times, Silbernagel owned all the stock of VALC and was its president. From 1969 until the time VALC

was incorporated, Silbernagel had been the president of a large mobile home loan servicing company; prior thereto, he had worked for about 8 to 10 years for an automobile loan servicing company. In his prior employment, Silbernagel procured loans and marketed them for sale in bulk to banks and savings and loan associations. Silbernagel had developed contacts at 200 to 250 banks and savings and loan associations with which he had worked. Utilizing his experience and contacts in the loan servicing industry, Silbernagel organized VALC and began providing loan procurement and marketing services, as well as collection and foreclosure services, primarily to mobile home mortgage lenders.

On March 1, 1987, VALC's mobile home mortgage servicing business, which at that time represented about 75 to 80 percent of the company's operations, was sold to WESAV Financial Corp. (WESAV) for approximately $2,180,000. The sale contract between WESAV and VALC included a covenant not to compete pursuant to which VALC agreed to refrain from owning or operating a mobile home loan servicing business for a period of 18 months. In addition, Silbernagel personally executed a consulting and noncompetition agreement with WESAV. That agreement noted Silbernagel's "substantial knowledge and expertise in the operation, management, business contacts, and research and development activities of the business" and required him to refrain from aiding any competitor or potential competitor for a period of 18 months. As compensation for services to be rendered and for his covenant not to compete,

Silbernagel was to receive $8,000 per month during the term of the agreement.

Despite VALC's and Silbernagel's noncompetition agreement with WESAV, VALC entered into a mortgage servicing agreement with Imperial Savings Association (Imperial) on November 4, 1987. Pursuant to that agreement, VALC agreed to service loans purchased by Imperial in bulk from other lenders; the agreement was prospective only and no loans were being serviced at the time the agreement was entered. The agreement required VALC to obtain all necessary business licenses, a fidelity bond protecting against losses caused by improper employee acts, and various insurance policies naming Imperial as the beneficiary.

In response to concerns raised by WESAV regarding VALC's covenant not to compete with WESAV, the servicing rights and obligations under the Imperial agreement were assigned to FAMC on December 12, 1987. At that time FAMC was not an active business entity and had been a dormant subsidiary of VALC since it was incorporated in 1986.

Shortly after the assignment of the Imperial contract to FAMC, and to further alleviate concerns over his covenant not to compete with WESAV, Silbernagel approached petitioners James Leste (Leste) and Richard Moore (Moore) to determine whether they would be interested in buying the stock of FAMC and operating the company as an independent loan servicing organization. Leste and Moore joined VALC in 1985 and held the positions of vice president of finance and senior vice president in charge of lending, respectively. Both

men were aware that VALC's servicing agreement with Imperial was causing Silbernagel to receive "a lot of flack" from WESAV. They knew that FAMC had not yet begun servicing loans, and they understood that FAMC would have to secure the appropriate business licenses, a fidelity bond, and various insurance policies prior to commencing loan service for Imperial.

Leste and Moore agreed to acquire the stock of FAMC, and they executed an agreement with VALC on February 25, 1988. Pursuant to this agreement, Leste and Moore each paid $10,000 to acquire all the outstanding stock of FAMC, and thereafter they became equal 50-percent shareholders of FAMC. In addition to the amounts paid for FAMC's stock, Leste and Moore each contributed $10,000 to FAMC's working capital to be used in acquiring office furniture and for other expenses associated with getting the business started. After purchasing the stock of FAMC, Leste and Moore served as the company's chief financial officer and president, respectively.

At the time Leste and Moore purchased the stock of FAMC, the company had not yet obtained the fidelity bond and insurance policies required pursuant to the Imperial loan servicing agreement. Although FAMC began servicing some large loan pools for Imperial in April 1988, FAMC's failure to obtain the fidelity bond and insurance policies resulted in a somewhat precarious relationship with Imperial. In September 1988, Stephen M. Wright (Wright), Imperial's senior vice president, wrote to Moore requesting that the fidelity bond and insurance requirements be satisfied within 30 days or "I will have no choice but to consider

pulling the servicing from your company." FAMC complied with Wright's request in October 1988.

Shortly after purchasing the stock of FAMC, Leste and Moore entered into discussions with a consultant, Donald G. Shirk (Shirk), who offered to assist FAMC in contacting banks and other mortgage lenders and in acting as a broker in the buying and selling of mobile home loan pools. In a letter to Moore dated March 10, 1988, Shirk stated that his services could assist FAMC "in developing large, profitable servicing portfolios." In his letter, Shirk proposed a fee for his services of $500 per day plus office rental expenses and reimbursement for other reasonable and verifiable expenses. An oral agreement was reached pursuant to which Shirk was hired as a consultant to FAMC on substantially the same terms as outlined in his letter to Moore. Thereafter, Shirk submitted billing statements to FAMC pursuant to the agreed per diem consulting fee and expense reimbursement arrangement. The record does not indicate whether Shirk entered into a covenant not to compete with FAMC.

Shirk provided consulting services to FAMC through March 1989, when it was determined that he was not generating an appropriate level of new business to replace FAMC's declining loan pool balances. Effective April 1, 1989, Shirk's compensation under the consulting agreement with FAMC was changed to a commission-only arrangement, whereunder Shirk was paid only when he brought in new business. In the final 5 months of the original per diem consulting arrangement, FAMC paid Shirk a total of $35,542 in consulting fees

and expense reimbursements.  There is no evidence in the record as to the payment of any fees to Shirk under the commission-based consulting agreement, and it appears that his consulting services to FAMC were essentially discontinued by April 1989.

At about that time, Leste and Moore entered into discussions with Silbernagel, who had previously offered to provide consulting services to FAMC.[2]  As the founder of VALC, and ultimately FAMC itself, and with his numerous contacts in the loan servicing industry, it was anticipated that Silbernagel would "add some muscle" to FAMC's marketing effort and help restore the company's declining loan pool balances.  On May 1, 1989, Silbernagel entered into a consulting and noncompetition agreement with FAMC. Under that agreement, Silbernagel's primary duty was to attract new business through direct sales and other marketing efforts designed to promote FAMC's loan servicing business.  Silbernagel was required to refer all loan servicing opportunities made known to him to FAMC, and he agreed not to compete with FAMC by directly or indirectly assisting FAMC's competitors. The consulting and noncompetition agreement with Silbernagel was incorporated into a multiyear contract commencing on May 1, 1989, and extending to April 1, 2002. During the first 7 years of the agreement, Silbernagel was to be paid the lesser of $300,000 per year or 25 percent of FAMC's after-tax profits; in conjunction therewith, FAMC

---

[2]  A consulting agreement with Silbernagel was previously proposed, but not executed, in August 1988.  At that time, Leste and Moore decided to give Shirk a little more time to see how much new business he could bring in.

was to advance to Silbernagel "a fully earned draw of $15,000 per month against annual compensation." Thereafter, the compensation limits and monthly draw amounts were to be reduced by 50 percent for the remaining years of the contract.

During the years in issue, Silbernagel contacted between 40 and 50 banks and other mortgage lenders, many of which he had worked with previously, in an effort to generate loan servicing business for FAMC. Approximately 95 percent or more of those contacts involved personal meetings with representatives of the mortgage lenders. Additionally, Moore and Silbernagel spoke over the phone approximately 15 times per month. Although Silbernagel did not submit billing statements to FAMC, through their regular phone conversations Moore was kept apprised of Silbernagel's activities, including any leads that Silbernagel had developed and whether any business was expected to come in.

Despite Silbernagel's efforts, FAMC did not receive the anticipated increase in loan servicing business, and it became increasingly difficult to support Silbernagel's consulting fees. In February 1990, FAMC reduced its payments to Silbernagel to $10,000 per month; in May 1991, the payments were further reduced to $5,000 per month. Silbernagel was aware of FAMC's financial difficulties and agreed to the reductions in his consulting fees.

In March 1992, Leste wrote to Silbernagel to inform him that his consulting agreement was to be terminated effective April 1, 1992. Silbernagel disagreed with the termination of the consulting agreement and in a letter to Leste, dated April 30, 1992,

Silbernagel stated: "I must insist that you continue with the reduced consulting fees as called for in our agreement or I will be required to take the necessary action to enforce the agreement." Despite the comments in his letter to Leste, Silbernagel did not pursue legal action to enforce the consulting agreement, nor did he receive any additional consulting fees from FAMC.

FAMC issued Forms 1099 to Silbernagel for the calendar years 1989, 1990, and 1991 in the respective amounts of $135,000, $110,000, and $65,000. Silbernagel indicated at trial that he reported these amounts as ordinary income from consulting services on his Federal income tax returns for the respective years.[3]

On its Federal income tax returns for its fiscal years ended October 31, 1989, 1990, and 1991, FAMC claimed deductions of $90,000, $130,000, and $75,000, respectively, for consulting fees paid to Silbernagel. Respondent disallowed these deductions, contending Silbernagel performed few or no consulting services for FAMC and that the payments to Silbernagel were in fact additional payments with regard to Leste's and Moore's purchase of FAMC's stock from VALC. Further, as a result of FAMC's payments to Silbernagel, respondent determined that Leste and Moore each had

---

[3] Silbernagel's tax returns were not introduced into evidence; however, respondent did not challenge Silbernagel's assertion that the consulting fees were reported as ordinary income.

received constructive dividends from FAMC in the amounts of $67,500, $55,000, and $32,500 for the calendar years 1989, 1990, and 1991, respectively.

_____

During 1989 and 1990, Leste received bonuses from FAMC in the amounts of $29,431 and $130,000, respectively. The entire amount of the 1989 bonus and one-half of the 1990 bonus were incorrectly reported as self-employment income on Leste's individual income tax returns for the respective years. Leste concedes that this error resulted in the overstatement of deductions for contributions to his pension plan, and that he is liable for excise taxes on the overstated amounts.

During 1990 and 1991, Moore received bonuses from FAMC in the amounts of $130,000 and $21,970, respectively. One-half of the 1990 bonus and the entire amount of the 1991 bonus were not reported on Moore's original income tax returns for the respective years. After respondent's examination of FAMC's returns had commenced, Moore filed an amended income tax return for 1990 reporting the additional $65,000 in bonus income for that year. Moore also has conceded that he is liable for the bonus income he failed to report on his 1991 return.

On its income tax return for the fiscal year ending October 31, 1991, FAMC claimed $202,525 for cost of goods sold. Respondent disallowed this amount in full, and FAMC concedes the disallowance.

OPINION

Section 162(a)(1) permits a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense. Compensation payments are deductible under section 162(a)(1) if they are reasonable and paid "purely for services" rendered to the business. Sec. 1.162-7(a), Income Tax Regs.

Petitioners contend that the payments to Silbernagel represent compensation for services rendered and for his agreement not to compete with FAMC. Respondent claims that the payments were, in substance, additional payments by Leste and Moore for the stock in FAMC. Respondent contends that FAMC is not entitled to deduct the payments under section 162(a)(1) because Silbernagel performed few or no consulting services for FAMC, and that such payments constitute constructive dividends to Leste and Moore to the extent of FAMC's earnings and profits.[4] Apschnikat v. United States, 421 F.2d 910, 913 (6th Cir. 1970); Smith v. Commissioner, 70 T.C. 651, 668 (1978).

Petitioners provided little documentation of the work performed by Silbernagel on behalf of FAMC. We are mindful, however, that the consulting and noncompetition agreement entered between FAMC and Silbernagel provided for fixed monthly payments to

---

[4] The parties agree that FAMC had sufficient earnings and profits in all relevant years such that all of the payments to Silbernagel would be eligible for treatment as constructive dividends.

Silbernagel regardless of the number of days worked, and the agreement did not require Silbernagel to submit billing statements or other summaries of his consulting activities.[5]

In determining the nature of FAMC's payments to Silbernagel, we consider Silbernagel's testimony, which we found highly credible. We are convinced that Silbernagel indeed performed consulting services for FAMC, which included utilizing his contacts in the mortgage lending industry in an attempt to generate business for FAMC and regularly discussing his activities in that regard with Moore. Further, Silbernagel testified that he reported the payments received from FAMC as ordinary income because he considered them to be compensation for consulting services rendered and for his covenant not to compete.

Silbernagel was hired as a consultant to FAMC at a time when the company's loan servicing business was declining. Leste and Moore, whom we also regard as credible witnesses, indicated that they expected Silbernagel's expertise and contacts in the mortgage lending industry to add muscle to FAMC's marketing effort and generate new loan servicing business, as well as smooth out FAMC's somewhat precarious relationship with Imperial. It is reasonable that Leste and Moore considered it worthwhile to pursue Silbernagel's offer to provide consulting services to FAMC and in

---

[5] As noted above, FAMC's prior consulting agreement with Shirk was a per diem and expense reimbursement arrangement, whereunder Shirk was required to submit monthly billing statements in order to get paid.

conjunction therewith FAMC secured from him a covenant not to compete.

The $20,000 VALC received from Leste and Moore for the stock of FAMC was not unduly low, and in our opinion none of the consulting fees paid to Silbernagel was for the FAMC stock. At the time Leste and Moore considered purchasing the stock of FAMC, they were aware of the speculative value of the Imperial loan servicing agreement assigned by VALC to FAMC. It was not clear at that time how much loan servicing business would be generated by the Imperial agreement. Nevertheless, Leste and Moore agreed to pay, and VALC accepted, $20,000 for all of FAMC's stock. Absent a showing that this was not an arm's-length agreement or a reasonable price to pay for the risky business opportunity FAMC provided, we will not disturb their judgment. We do not find, as respondent contends, that the consulting and noncompetition agreement between FAMC and Silbernagel more than 14 months after Leste and Moore purchased FAMC's stock was intended to provide additional consideration to Silbernagel in connection with that purchase.

We also consider the amounts paid Silbernagel pursuant to his consulting and noncompetition agreement with FAMC to be reasonable in light of his expertise and contacts in the mortgage lending industry. FAMC paid Shirk a total of $35,542 during the final 5 months of his per diem and expense reimbursement consulting agreement, or on average approximately $7,000 per month. Shirk's consulting agreement apparently did not contain a covenant not to compete with FAMC. Silbernagel's agreement with FAMC, however,

contained both a consulting services component and a covenant not to compete. While the covenant not to compete did not have a separately stated consideration, it did represent an additional commitment on Silbernagel's part, supplemental to the consulting commitment, and it was an added value for the consideration FAMC was to pay Silbernagel monthly. (Silbernagel had previously been paid $8,000 per month for a covenant not to compete with WESAV for a period of 18 months following WESAV's purchase of VALC's mobile home mortgage servicing business.[6]) We believe the $15,000 monthly fee paid to Silbernagel constitutes reasonable compensation for both the consulting services component and the covenant not to compete in the agreement between Silbernagel and FAMC.[7] Consequently, we hold that: (1) FAMC is entitled to deduct all of the payments made to Silbernagel pursuant to the consulting and noncompetition agreement entered between those parties;[8] (2) there

___

[6]    Although the agreement with WESAV also required Silbernagel to assist in effecting a smooth transfer of the business, we find that the payments under the agreement were primarily designed to compensate him for his covenant not to compete with WESAV for a period of 18 months following the sale.

[7]    In determining that the $15,000 monthly fee was reasonable, we recognize that there were subsequent reductions of the monthly payment to $10,000 in February 1990, and to $5,000 in May 1991. Those reductions were the result of arm's-length negotiations precipitated by the decline in FAMC's loan servicing business and the company's resulting financial difficulties.

[8]    Respondent suggests on brief that the payments under the consulting and noncompetition agreement between Silbernagel and FAMC were limited to the lesser of $300,000 per year or 25 percent of FAMC's after-tax profits, and therefore, FAMC's deduction should likewise be limited to this amount. Moore testified at trial, however, that the monthly payments to

(continued...)

are no constructive dividends to the individual petitioners; and (3) the accuracy-related penalties under section 6662(a) relating to this issue are not applicable.

The remaining issues for decision are: (1) Whether the Lestes and the Moores are liable for accuracy-related penalties under section 6662(a) for their failure to properly report bonus income received from FAMC, and (2) whether FAMC is liable for the section 6662(a) accuracy-related penalty for claiming cost of goods sold of $202,525 which the parties have agreed was improper.

Section 6662(a) imposes a penalty on any portion of an underpayment that is attributable to negligence or disregard of rules and regulations. In the instant case, petitioners have conceded that they are liable for the underlying deficiencies resulting from the improperly reported bonus income and cost of goods sold amounts.

A taxpayer must establish error in the Commissioner's determination that he or she is liable for the penalty provided by section 6662(a). Rule 142(a); Estate of Monroe v. Commissioner, 104 T.C. 352, 366 (1995). Petitioners offered no evidence at trial concerning the negligence penalties and failed to address the issue

---

8(...continued)
Silbernagel under the consulting and noncompetition agreement were his "fully earned draw" and that he could earn more but not less than the agreed $15,000 per month "floor". As noted previously, respondent did not challenge Silbernagel's assertion that he reported all of the consulting fees received from FAMC as ordinary income on his individual income tax returns, nor is there any evidence that Silbernagel returned any of the payments to FAMC.

on brief.[9]    Accordingly, to the extent that respondent has prevailed on the underlying issues, her corresponding determination of the applicable penalties is sustained.

To reflect the foregoing and the concessions of the parties,

Decisions will be entered

under Rule 155.

---

[9]    Petitioners did, however, attach a document to their posttrial reply brief purporting to be an audit notification letter sent from an Internal Revenue Service agent to Moore on Nov. 23, 1992.  Presumably, petitioners intend this document to exculpate Moore from the negligence penalty for 1990 by establishing that Moore filed his amended 1990 return reporting the additional $65,000 in bonus income prior to being informed by respondent that his return was under audit.  The document attached to petitioner's posttrial reply brief, however, was not introduced at trial and, therefore, is not part of the record in this case.  Rule 143(b).  Additionally, we note that the parties have stipulated that Moore filed his amended 1990 return after respondent's examination of FAMC's returns had commenced.  Based on our review of the record in this case, and petitioners' failure to address the negligence issue at trial or on brief, we conclude that petitioners have not carried their burden of proof and, accordingly, are liable for the accuracy-related penalties under sec. 6662(a) pertaining to the conceded deficiencies.